**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1071**

GEORGE COOPER, SR.,

        Plaintiff – Appellee,

   and

GEORGE COOPER, JR.,

        Plaintiff,

      v.

JAMES SHEEHAN; BRIAN CARLISLE,

        Defendants – Appellants,

   and

BRUNSWICK COUNTY SHERIFF'S DEPARTMENT; SHERIFF RONALD
HEWETT; DAVID CROCKER; GENE CAISON; KEVIN HOLDEN; JOHN
INGRAM,

        Defendants.

Appeal from the United States District Court for the Eastern
District of North Carolina, at Wilmington.  James C. Dever III,
Chief District Judge.  (7:10-cv-00014-D)

Argued: September 20, 2013      Decided: November 7, 2013

Before WILKINSON, KING, and WYNN, Circuit Judges.

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Wilkinson and Judge Wynn joined.

---

**ARGUED:**  Christopher J. Geis, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellants.  Laura Conner, Robert M. Tatum, TATUM & ATKINSON, PLLC, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  James R. Morgan, Jr., James A. Dean, WOMBLE CARLYLE SANDRIDGE & RICE, PLLC, Winston-Salem, North Carolina, for Appellants.

---

KING, Circuit Judge:

Late in the evening of May 2, 2007, George Cooper, Sr., was alerted to the sound of unknown persons outside his mobile home in rural Leland, North Carolina. Lowered shotgun in hand, Cooper stepped out onto his back porch to investigate. Seconds later, he was struck by gunfire. The shots were fired by Brunswick County deputy sheriffs James Sheehan and Brian Carlisle (the "Officers"), who were investigating a reported domestic disturbance on Cooper's property. Cooper survived, and he subsequently initiated this civil action in the Eastern District of North Carolina, alleging claims under 42 U.S.C. § 1983, as well as state law claims, arising from the shooting incident.

The Officers moved for summary judgment, which was granted in part and denied in part. See Cooper v. Brunswick Cnty. Sheriff's Dep't, 896 F. Supp. 2d 432 (E.D.N.C. 2012). In pertinent part, the district court denied the Officers' assertions of qualified and public officers' immunity from, respectively, Cooper's federal and state excessive force claims. Invoking the collateral order doctrine, the Officers seek appellate relief from the immunity aspects of the court's decision. As explained below, we affirm.

3

I.

A.

On the day of the shooting, Cooper and his cousin Paul Herring spent several hours repairing the floor of a nearby relative's home.[1] Upon finishing the work, Herring agreed to join Cooper for dinner. At around 9:00 p.m., Herring arrived at Cooper's residence, and the two men enjoyed the evening in the backyard, talking about "[f]ootball games [and] old fights." Cooper, 896 F. Supp. 2d at 436.[2] Cooper may have enjoyed the mid-spring evening a little too much, smoking marijuana laced with cocaine, and chasing "three or four beers" with a pint of brandy. Id. at 437. Afterward, the men retired to Cooper's mobile home to prepare the meal.

Just after 11:00 p.m., a neighbor called 911 "to report that an altercation was occurring at the Cooper property." Cooper, 896 F. Supp. 2d at 437 n.2. The 911 dispatcher relayed the call to the Officers, reporting that the disturbance "sound[ed] like two males screaming at each other." Id. at 437.

_____

[1] In light of our limited jurisdiction over collateral orders denying claims of qualified immunity, see infra Part II, we are obliged to accept the facts "as the district court viewed them." See Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).

[2] All internal quotation marks from the district court's opinion are omitted.

The dispatcher did not indicate whether the men were armed or otherwise dangerous. Around 11:30 p.m., the Officers arrived in the vicinity of Cooper's mobile home, Carlisle driving a standard patrol car and Sheehan in an unmarked vehicle. Neither of the Officers activated his blue lights or siren. As Carlisle approached in his vehicle, he "could hear screaming . . . coming from [the] property." Id. He also saw "a black male" — not Cooper — "standing on the [mobile home's] back porch." Id.[3] Carlisle perceived that the man on the porch observed the approaching police cars, after which he went inside the mobile home. Sheehan also saw a man standing on the porch.

The Officers parked on the grass at the edge of Cooper's property and approached the mobile home on foot. They could hear what sounded like a heated argument inside, but could not make out any words. Carlisle also heard "screaming" and "people walking around inside the [mobile home]." Cooper, 896 F. Supp. 2d at 438. To alert the occupants of the Officers' presence, Sheehan "tapp[ed] on the window" with his flashlight, but neither of the Officers announced his presence or identified himself as a deputy sheriff. Id.

---

[3] Cooper was in the mobile home's kitchen when the Officers arrived, and he never saw the Officers' police vehicles.

5

In response to the sound at his window, Cooper uttered some obscenities, which the Officers heard. Cooper then peered out the back door (the mobile home's primary entrance), but saw nothing. Cooper called out for anyone in the yard to identify himself, but no one responded. Electing to venture outside to investigate the noise, Cooper retrieved the twenty-gauge shotgun he kept by the door. With the butt of the firearm in his right hand and its muzzle pointed toward the ground, Cooper "opened the back door and took two or three steps on to his darkened porch." Cooper, 896 F. Supp. 2d at 437. By that time, the Officers had progressed to an adjacent area and were advancing toward the porch. Within a few feet of the porch steps, Sheehan stumbled over a concrete block. As Sheehan regained his balance, Cooper emerged with his shotgun.

Reacting to the sight of Cooper and his shotgun, the Officers drew their service weapons and commenced firing without warning.[4] Cooper felt two bullets hit his body and then turned toward the mobile home's door. The Officers continued shooting,

---

[4] The district court observed that the parties had presented "dramatically different accounts" of the moments immediately preceding the shooting. Cooper, 896 F. Supp. 2d at 438. In the Officers' version, the back door "flew open," after which Cooper immediately "raise[d] [the shotgun] up to his hip and fire[d] one time." Id. For purposes of the qualified immunity analysis, however, the court concluded that it had to accept Cooper's account — that the shotgun was unloaded and he did not shoot. Id. at 446.

6

and Cooper felt himself hit "a couple of more times" before collapsing to the ground. Cooper, 896 F. Supp. 2d at 439. The Officers discharged between eleven and fourteen rounds, and Cooper was hit five or six times, incurring wounds in the elbow, ankle, back, buttocks, and stomach.

B.

On January 29, 2010, Cooper filed this lawsuit, naming as defendants the Brunswick County Sheriff's Department, the current and former Sheriffs, plus several deputies, including the Officers.[5] The Complaint included eighteen counts, alleging violations of both state and federal law.[6] The claims against the Sheriff's Department were dismissed early in the litigation. Following discovery, on February 1, 2012, the remaining defendants moved for summary judgment. In addition to various defenses, the Officers asserted qualified immunity from Cooper's federal claims, as well as public officers' immunity from

---

[5] Cooper's eight-year-old son, George Cooper, Jr., was present in the mobile home when the shooting occurred, and he was a named plaintiff in the Complaint. Because the necessary procedural steps to pursue the case on Cooper Jr.'s behalf were never taken, the elder Cooper proceeds as the sole plaintiff.

[6] The federal claims were that the defendants violated Cooper's Fourth and Fourteenth Amendment rights, made actionable by 42 U.S.C. § 1983, and that the defendants were motivated to do so by racial animus, as proscribed by 42 U.S.C. § 1981. The state law claims included several common law torts, violations of North Carolina's constitution, and civil conspiracy.

7

Cooper's state law claims. By its September 27, 2012 decision, the district court granted summary judgment to all defendants on most counts. The only claims reserved for trial were asserted against the Officers — Cooper's Fourth Amendment excessive force claims and his state law assault, battery, negligence, and gross negligence claims.

In allowing those claims to go forward as to the Officers, the district court specifically rejected their assertions of federal and state immunity. The court relied heavily on our unpublished opinion in Pena v. Porter, 316 F. App'x 303 (4th Cir. 2009). There, a pair of officers searching for a fugitive came to Pena's door late at night, but did not identify themselves. Pena awoke to the sound of his dogs barking and, with no knowledge that the police were outside, opened his door while holding a rifle pointed toward the ground. One of the officers saw the firearm and immediately fired two shots that struck Pena. Pena sued under § 1983 and North Carolina law, and the officers asserted qualified and public officers' immunity. Viewing the facts in the light most favorable to Pena, the district court denied the officers' immunity claims, and we affirmed. We agreed that, under the circumstances, Pena had a "perfectly reasonable" rationale for holding the rifle, which "should have been apparent to [the officers] at the time of the shooting." Id. at 312. For purposes of summary judgment, we

8

concluded that Pena's rights had been violated because "[a]bsent any additional factors which would give the [officers] probable cause to fear for their safety or the safety of others, the mere presence of a weapon is not sufficient to justify the use of deadly force." Id.

Finding Pena's facts analogous and its reasoning persuasive, the district court here concluded that "Pena supports [Cooper's] argument" against the Officers' claims of qualified immunity. Cooper, 896 F. Supp. 2d at 446. "Accepting [Cooper's] account as true," the court resolved that "the totality of the circumstances [did] not establish that [the Officers] had probable cause to believe that [Cooper] was dangerous when [he] stepped onto his unlit porch at 11:30 p.m., holding a shotgun pointing down, asked who was there, heard nothing, and then was shot a few seconds later." Id. The court acknowledged that "if [Cooper] had . . . stepped onto a dark porch armed despite knowing law enforcement officers were approaching his door, that certainly could affect a reasonable officer's apprehension of dangerousness." Id. at 447. Critically, however, the court determined that "no reasonable officer could have believed that [Cooper] was aware that two sheriff deputies were outside" when he stepped onto the porch. Id.

9

Thus, "[a]bsent a threatening act, like raising or firing the shotgun," the district court ruled that the Officers' decision to use deadly force was not objectively reasonable. Cooper, 896 F. Supp. 2d at 447-48. Moreover, after reviewing the applicable legal principles, the court observed that Cooper's "Fourth Amendment right to remain free from the unreasonable use of deadly force was clearly established" at the time of the shooting incident. Id. at 448. On the basis of those conclusions, the court decided that the Officers were not entitled to qualified immunity from Cooper's § 1983 excessive force claims.[7] The Officers thereafter timely noted this appeal, asserting jurisdiction under the collateral order doctrine.

## II.

Because this is not a typical final order appeal, we first satisfy ourselves of our jurisdiction in this proceeding. See Mort Ranta v. Gorman, 721 F.3d 241, 245 (4th Cir. 2013). Absent

---

[7] The district court determined that Cooper's state law excessive force claims "arise out of the same facts" as his Fourth Amendment excessive force claims. Cooper, 896 F. Supp. 2d at 453. Recognizing that resolution of the state law claims likewise turned on the "reasonableness" of the Officers' use of deadly force, the court denied summary judgment on those claims by reference to its analysis of the federal claims. Id. at 453-54.

10

jurisdiction, we would be constrained to dismiss the Officers' appeal, regardless of its merits.

Pursuant to the collateral order doctrine, we are authorized to review an appeal from a district court's denial of qualified immunity, see Mitchell v. Forsyth, 472 U.S. 511, 530 (1985), unless the order determined only a question of "evidence sufficiency," see Johnson v. Jones, 515 U.S. 304, 313 (1995). Put another way, "we possess no jurisdiction over a claim that a plaintiff has not presented enough evidence to prove that the plaintiff's version of the events actually occurred, but we have jurisdiction over a claim that there was no violation of clearly established law accepting the facts as the district court viewed them." Winfield v. Bass, 106 F.3d 525, 530 (4th Cir. 1997) (en banc).[8]

---

[8] Inasmuch as every denial of summary judgment, by definition, involves a determination that the evidence is sufficiently disputed to raise triable issues, the mere existence of disputed facts — even critical facts — does not deprive us of jurisdiction. See Winfield, 106 F.3d at 529. As long as the appellants do not argue the sufficiency or validity of the facts on appeal, but rather, as in Mitchell v. Forsyth, seek to apply clearly established law to a given set of facts, we are properly vested with jurisdiction. See Johnson, 515 U.S. at 313. Indeed, "[i]f this central question, whether given facts show a violation of established law, is not subject to immediate appeal, a public official's right to appeal denials of qualified immunity will be of less than little worth." Winfield, 106 F.3d at 535 (Wilkinson, J., concurring).

The Officers' contentions on appeal fall squarely within the category of claims, described in Winfield, that we are permitted to review. Although the Officers mention evidence that they believe will ultimately disprove Cooper's version of the facts, for purposes of this appeal they have accepted the facts as viewed by the district court. Proceeding from that foundation, the Officers make the legal argument that they did not contravene Cooper's constitutional rights. In these circumstances, we are satisfied of our jurisdiction under the collateral order doctrine, and we proceed to the merits of the Officers' qualified immunity claims.

III.

A.

Section 1983 of Title 42 creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States. Nevertheless, a government official sued under § 1983 is entitled to invoke qualified immunity, which is more than a mere defense to liability; it is immunity from suit itself. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). As we have explained, "qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions

12

were lawful." Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

The Officers maintain that the district court erred in denying them qualified immunity from Cooper's excessive force claims under § 1983. We review de novo the legal issues arising from a district court's denial of qualified immunity. Washington v. Wilmore, 407 F.3d 274, 281 (4th Cir. 2005). In assessing whether a defendant is entitled to qualified immunity, a court must "use the two-step procedure of Saucier v. Katz, 533 U.S. 194 (2001), that asks first whether a constitutional violation occurred and second whether the right violated was clearly established." Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010). A constitutional right is "clearly established" when "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal quotation marks omitted).

The Complaint alleges that the Officers violated Cooper's constitutional rights through the use of excessive force. See Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005) (explaining that seizure effectuated by excessive force contravenes Fourth Amendment). We have instructed that "[w]hether an officer has used excessive force is judged by a standard of objective reasonableness." Clem v. Corbeau, 284

13

F.3d 543, 550 (4th Cir. 2002). As further explained in Clem, "recognizing that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — we take care to consider the facts from the perspective of a reasonable officer on the scene, and avoid judging the officer's conduct with the 20/20 vision of hindsight." Id. (internal quotation marks omitted).

A reasonable officer is entitled to use deadly force "[w]here the officer has probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." Tennessee v. Garner, 471 U.S. 1, 11 (1985). Nevertheless, as the Officers concede, the mere possession of a firearm by a suspect is not enough to permit the use of deadly force. Thus, an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon. Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is threatened with the weapon. See id. at 11-12.[9]

---

[9] To be clear, an armed suspect need not engage in some specific action — such as pointing, aiming, or firing his weapon — to pose a threat. Pursuant to Tennessee v. Garner and its progeny, there are many circumstances under which a police officer could reasonably feel threatened.

14

The Officers rely on several decisions concluding that a police officer was entitled to qualified immunity after shooting an individual whom the officer mistakenly believed to be armed. In Anderson v. Russell, for example, the officers ordered a detainee to his hands and knees, and then shot him when he reached for a bulge in his waistband that turned out to be a radio. See 247 F.3d 125 (4th Cir. 2001). In an earlier decision, McLenagan v. Karnes, a bystander was shot as he ran toward a police officer moments after the officer learned that an armed arrestee was on the loose in the area. See 27 F.3d 1002 (4th Cir. 1994). And in Slattery v. Rizzo, an officer shot a suspect who ignored commands to show his hands before turning quickly toward the officer with what turned out to be only a beer bottle in a clinched fist. See 939 F.2d 213 (4th Cir. 1991). If deadly force was justified in such circumstances, the Officers contend, it is even more appropriate in this setting, where Cooper wielded a shotgun in plain view. Instead of supporting the Officers' contentions, however, those decisions emphasize why the use of deadly force against Cooper was not constitutionally permissible:  in each of the above scenarios, the objective basis for the threat was real, but the gun was not. Here, the shotgun was real, but — taking the facts as the district court viewed them — the threat was not.

15

When the Officers fired on Cooper, he stood at the threshold of his home, holding the shotgun in one hand, with its muzzle pointed at the ground. He made no sudden moves. He made no threats. He ignored no commands. The Officers had no other information suggesting that Cooper might harm them. Thus, the facts fail to support the proposition that a reasonable officer would have had probable cause to feel threatened by Cooper's actions.

Importantly, the Officers never identified themselves — even when asked by Cooper. If the Officers had done so, they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat. See Elliot v. Leavitt, 99 F.3d 640, 644 (4th Cir. 1996) ("No citizen can fairly expect to draw a gun on police without risking tragic consequences."). Instead, we are constrained to agree with the district court that "no reasonable officer could have believed that [Cooper] was aware that two sheriff deputies were outside," as he stepped onto his back porch. Cooper, 896 F. Supp. 2d at 447.[10] As in Pena v. Porter, on which the court

---

[10] The Officers contend that they did not need to announce their presence while approaching the mobile home, because they believed the unidentified man on Cooper's back porch had observed them in their police vehicles. The Officers surmised that the unidentified man's observation led him to perceive that the vehicles were headed to Cooper's mobile home, which in turn prompted him to go inside to warn the occupants. If the (Continued)

16

relied, Cooper's "perfectly reasonable" rationale for bearing a firearm while investigating a nocturnal disturbance on his own property "should have been apparent to [the Officers] at the time of the shooting." See 316 F. App'x 303, 312 (4th Cir. 2009).

With respect to the second part of the Saucier analysis, the precedent discussed herein amply demonstrates that the contours of the constitutional right at issue — that is, the right to be free from deadly force when posing no threat — were clearly established at the time the Officers shot Cooper. Accordingly, the district court properly denied, at the summary judgment stage, the Officers' invocation of qualified immunity from Cooper's § 1983 excessive force claims.

B.

The Officers also seek relief from the district court's denial of public officers' immunity with respect to Cooper's state law tort claims. Under the collateral order doctrine, we possess jurisdiction to review the denial of claims for state law immunities that provide insulation from suit, as opposed to those that merely protect an official from liability. See Gray-Hopkins v. Prince George's Cnty., Md., 309 F.3d 224, 231 (4th

_____

Officers predicated their use of deadly force on such assumptions, it was unreasonable for them to do so.

17

Cir. 2002). Indeed, pursuant to the collateral order doctrine, we have exercised appellate jurisdiction to review a pretrial order denying North Carolina public officers' immunity. See Bailey v. Kennedy, 349 F.3d 731, 738 (4th Cir. 2003).

As the district court properly explained, "[t]he merits of [Cooper's] assault, battery, negligence, and gross negligence claims are tied to the reasonableness of [the Officers'] actions." Cooper, 896 F. Supp. 2d at 454. That ruling was predicated on the proposition that, under North Carolina law, public officers' immunity is unavailable to a police officer who acts with malice. See Bailey, 349 F.3d at 731; see also Grad v. Kassa, 321 S.E.2d 888, 890 (N.C. 1984). An officer acts with malice when he "does that which a man of reasonable intelligence would know to be contrary to his duty," i.e., when he violates a clearly established right. Bailey, 349 F.3d at 742. And, at the time of this incident in May 2007, it was clearly established that a North Carolina law enforcement officer could use deadly force only when reasonably necessary to defend against "the use of or imminent use of deadly physical force." N.C. Gen. Stat. § 15A-401(d)(2)(a). Inasmuch as the analysis of public officers' immunity is functionally identical to our discussion of the Officers' entitlement to qualified immunity with respect to the § 1983 claims, the state law claims are "subsumed within the federal excessive force claim[s] and so go

18

forward as well." See Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994).

## IV.

Pursuant to the foregoing, we reject the Officers' immunity claims and affirm the district court.

AFFIRMED