SHEDD, Circuit Judge, dissenting: Reasonableness under the Fourth Amendment “is evaluated from the perspective of the officer on the scene, not through the more leisurely lens of hindsight.” Abney v. Coe, 493 F.3d 412, 416 (4th Cir. 2007). Today’s decision, however, continues the shift that began in Henry v. Purnell, 652 F.3d 524 (4th Cir. 2011) (en banc), where “judge[s] engage[] in post hoc evaluation of police conduct ... [and] imagine some alternative means by which the objectives of the police might have been accomplished.” United States v. Sharpe, 470 U.S. 675, 686-87, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Here, the majority has transformed a chaotic series of events that took place in a matter of seconds into a routine police call whereby, if only the Deputies[1] had acted as the majority would prefer, perhaps David Lee Hensley might still be alive. While Hensley’s death is a tragedy, tragedy does not equal liability. When the undisputed facts are judged from the Deputies’ perspective, it becomes apparent that they did not violate Hensley’s constitutional rights. Moreover, even assuming otherwise, the district court erred in determining if the Deputies violated clearly established law. Therefore, I respectfully dissent. I. Just after 6 a.m. on the morning of August 9, 2012, Shirley Ferguson, Hensley’s mother-in-law, called 911 to report a possible domestic disturbance at Hensley’s home. Hensley had been agitated overnight, telling his daughter Rachelle that they were the only people left on Earth and asking Rachelle to call his wife and have her come home from work. Hensley also indicated that he wanted to die. When Shirley called to check on Rachelle, Hensley answered and told her he was “going to kill GDB [sic] with a knife” before slamming the phone down, Hensley’s behavior during the phone call prompted Shirley’s 911 call. Two Haywood County Sheriffs Deputies, Lieutenant Michael Price and Deputy Keith Beasley, responded to the call. As relayed to the Deputies, the call was a civil disturbance involving a person possibly under the influence of drugs: the subject was on his porch yelling and screaming at someone inside his house. The Deputies drove separate marked vehicles to the residence. As they approached Hensley’s home, an elderly man flagged down Lieutenant Price to tell him that Hensley had kept the neighborhood up all night. The dispatcher also called the Deputies to provide an update: Shirley had called 911 a second time and indicated that Hensley may have hurt her granddaughters. As they approached Hensley’s residence, Lieutenant Price was the lead car. Lieutenant Price, however, missed the turn for Hensley’s driveway; Deputy Beasley thus pulled in first and began proceeding down the driveway. Inside the house, Hensley saw the police cars approaching, ran into his bedroom, and reached under his mattress to retrieve the key to his gun safe. He then opened the safe and removed a long-nose revolver. Rachelle and her sister, H.H., attempted to stop Hensley, but were unable to do so. All three then exited the house onto the front porch and saw the two police cars in their driveway.[2] Lieutenant Price and Deputy Beasley were stopped in front of the residence as Hensley and his daughters spilled out onto the porch. Hensley was openly carrying the gun as he exited the house, and both Deputies saw him with the weapon. In response to seeing Hensley with a gun, Deputy Beasley immediately threw himself down across his front seat and put his car in reverse. Because, however, Deputy Beasley could not be sure of Lieutenant Price’s location and was concerned about injuring Lieutenant Price, he put his car back into park and remained in a position of cover lying across the front seat. Lieutenant Price radioed, “It’s a gun! Gotta gun!” and backed his car further up the driveway. (J.A. 633). Lieutenant Price then exited his vehicle taking a “low ready” position. At that point, Hensley and Rachelle briefly wrestled for the gun. Hensley won the struggle and struck Rachelle in the back of the head with the gun. Rachelle and H.H. screamed for help from the Deputies, but neither officer issued a verbal command or approached the house.[3] After striking Rachelle with the gun, Hensley let go of her and proceeded down the porch steps. Rachelle testified that, while she did not see Hensley drop the gun, she lost sight of the gun as he left the porch. H.H. testified that the gun was not in Hensley’s right hand, buj; that she could not see his left hand. She also testified that his hands remained by his side as he left the porch. Before Hensley stepped off the porch, he turned to tell H.H. that he loved her. Hensley left the porch and stepped into the front yard before veering off and walking directly toward Deputy Beasley’s car. As Hensley was leaving the porch, Deputy Beasley, afraid that he was going to be trapped in his car, kicked open his vehicle door, exited the vehicle, and began quickly moving to a defensive position at the back of his car further away from the oncoming Hensley. Deputy Beasley saw that Hensley, who was about 30 feet away, was walking toward him with the gun in his hand. Deputy Beasley fired three shots as he continued Aoving away from the perceived threat. At roughly the same time, Lieutenant Price, concerned that Deputy Beasley. \vas pinned inside his vehicle, fired two shots at Hensley as Hensley headed toward. Deputy Beasley’s car.[4] Hensley was killed by a single bullet to the head. North Carolina State Bureau of Investigation Agents recovered a long-nosed revolver, which matched the description of the gun given by the Deputies, from underneath Hensley’s body. Following an, investigation, no charges were brought against Lieutenant Price or Deputy Beasley. The audio log of the patrol cars’ communications shows that less than fifteen seconds elapsed from the time Lieutenant Price stated, “It’s a gun! Gotta gun!” to the time shots were fired. (J.A. 633). Hensley’s family (the Plaintiffs) filed this civil action, raising a variety of state and federal .claims, including a 42 U.S.C. § 1983 claim for excessive force. Following discovery, the Deputies moved for summary judgment, arguing that they were entitled to qualified immunity. The district court denied the motion. Hensley v. Suttles, 167 F.Supp.3d 763 (W.D.N.C. 2016). The court explained that, accepting the Plaintiffs’ version of events, Hensley was holding the gun at his side as he exited the porch and began walking toward the Deputies and that, “[i]f the defendant did not point his gun at Beasley as he made his way across the front yard, as Plaintiffs’ forecast of evidence shows, then no reasonable officer could have objectively concluded that the decedent was a danger to the deputies’ lives or safety warranting the use of deadly force.” Id, at 763. Given this conclusion, the court then determined that “both prongs of the qualified immunity analysis are. satisfied” because “(1) Defendants violated decedent’s constitutional rights when they unlawfully seized him ... through the use of excessive force, and (2) it was clearly established at the time that the deputies could not seize, the decedent in the manner in which they did.” Id. at 764. The Deputies timely appealed. II. I would reverse.[5] On these .facts, summary judgment is appropriate for the Deputies on the § 1983 claim because they did not violate Hensley’s constitutional rights. “We review de novo a district court’s denial of summary judgment and qualified immunity, construing all' facts in the light most favorable to the nonmovant.” Orem v. Rephann, 623 F.3d 442, 445 (4th Cir. 2008). For appeals involving qualified immunity, we accept the facts as stated by the district court and determine “whether, based on those facts, a reasonable person in the defendant’s position could have believed that he or she was acting in conformity with the clearly established law at the time.” Gray-Hopkins v. Prince George’s Cty., 309 F.3d 224, 229 (4th Cir. 2002). “In reviewing a district courts decision rejecting a defendant’s assertion of qualified immunity, we apply the analysis set forth by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), as modified by the Court’s later decision in Pearson [v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)].” Danser v. Stansberry, 772 F.3d 340, 346 (4th Cir. 2014). Pursuant to Saucier and Pearson, we ask whether the Deputies violated Hensley’s constitutional rights and, if so, “whether the right at issue was ‘dearly established’ at the time of the events in question.” Id. We may use our “discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.” Pearson, 566 U.S. at 236, 129 S.Ct. 808. “Qualified immunity protects officers who commit constitutional violations-'but who, in light of clearly established law, could reasonably believe that their actions were lawful.” Henry, 652 F.3d at 531. When asking if a right is clearly established at the time of the constitutional violation, we do not ask “whether the right allegedly violated was established ‘as a broad general proposition’ but whether, ‘it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.’” Raub v. Campbell, 785 F.3d 876, 882 (4th Cir. 2015) (quoting Saucier, 533 U.S. at 201-202, 121 S.Ct. 2151). The Supreme Court recently reiterated that: While this Court’s case law “do[es] not require a case directly on point” for a right to be clearly established, “existing precedent must have placed the statutory or constitutional question beyond debate.” Mullenix v. Luna [— U.S.-] 136 S.Ct. 305, 308 [193 L.Ed.2d 255] (2015). In other words, immunity protects “all but the plainly incompetent or those who knowingly violate the law.” Id. White v. Pauly, — U.S.-, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) (emphasis added). Here, the Plaintiffs allege that the Deputies used excessive force. Excessive force claims “should be analyzed under the Fourth Amendment and its ‘reasonableness’ standard.” Graham v. Connor, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The standard is objective, asking if a reasonable officer in .the same circumstances would have concluded-that the existent, threat justified the -use of force. Id. at 397, 109 S.Ct. 1865. A police officer may use deadly force when the officer has “probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others.” Tennessee v. Garner, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1, (1985). In applying this standard,: “[t]he ‘reasonableness’ of a. particular use of force must be judged from the perspective of a reasonable officer on the scene, rather -than with the 20/20. vision of hindsight.” Graham, 490 U.S. at 396, 109 S.Ct. 1865. A reviewing court must make “allowance for the fact that police officers are often forced to make split-second judgments [here, certainly so]—in circumstances that are tense,- uncertain, and rapidly evolving.” Id. at 397, 109 S.Ct. 1865. “The court’s focus should be on the circumstances = at the moment force was used and on the fact that officers- on the’beat are not often afforded the luxury of armchair reflection.” Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996). A. Judging the'facts from the perspective of a reasonable officer on the scene, the Deputies did not violate Hensley’s constitutional rights' by using deadly force. The Deputies were responding to a domestic disturbance call, one that turned out to be extreme evein for that category of calls because it involved, an armed individual acting irrationally who used force against what appeared to be a close family member in the presence of the police. “[T]he volatility of situations involving domestic violence makes them particularly dangerous. When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call.” Mattos v. Agarano, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) (internal quotation marks omitted). While driving to Hensley’s residence, the Deputies learned that Shirley had called 911 again to express concern for the safety of her grandchildren. In addition, a neighborhood resident stopped Lieutenant Price to tell him that Hensley had been keeping the neighborhood up the entire night. Thus, a reasonable officer would have known they were approaching a highly volatile situation with an agitated individual and several potential victims. Upon arriving at Hensley’s residence, the Deputies were met by Hensley coming onto the porch openly carrying and displaying a gun. In response to the police presence, rather than attempting to diffuse the situation, Hensley began wrestling with his daughter for control of the gun before striking her in the head with it. At that moment the violence officers fear is lurking at every domestic disturbance call manifested itself before them. Hensley then moved his daughter aside, stepped off the porch, and began walking toward Deputy Beasley’s patrol car, closing to within 30 feet.[6] Less than fifteen seconds elapsed from the time the officers pulled into the driveway until the time the shots were fired. During that time, both officers took defensive positions and postures—like Deputy Beasley throwing himself down on his front seat—that were consistent with their belief that they were seriously under threat and afraid for their lives. A reasonable officer would have believed that Deputy Beasley was under imminent threat of serious physical harm: Hensley began a continuous pattern of aggressive and threatening behavior from the moment the officers arrived and was within 30 feet of Deputy Beasley and armed with a gun— with no suggestion that he was slowing down or attempting to communicate with the Deputies—at the time the Deputies fired.[7] Cooper v. Sheehan, 735 F.3d 153 (4th Cir. 2013), which the majority relies upon, does not require a different result. In fact, properly read, Cooper supports summary judgment for the Deputies. Our holding in Cooper rested in part on the fact that Cooper never knew the people on his property were police officers. We noted that, if the officers had made their presence known, a fact undisputed in this case, that “they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat.” Id. at 159. Thus, Cooper supports the Deputies here: they arrived in marked cars that Hensley identified and Hensley responded to their presence by immediately retrieving a gun and coming outside to confront them. Once free of Rachelle, Hensley advanced off the porch and toward Deputy Beasley’s marked police car while carrying a gun. Under these facts, the Deputies were “safe in the assumption” that Hensley “pose[d] a deadly threat.” Id. See also Elliott, 99 F.3d at 644 (“No citizen can fairly expect to draw a gun on police without risking tragic consequences.”). Viewed without 20/20 hindsight, this case falls within the heartland of cases in which we have consistently granted summary judgment to police officers using deadly force: See, e.g., Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001) (“This Circuit has consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action.”). See also Sigman v. Chapel Hill, 161 F.3d 782, 787-88 (1998) (no constitutional violation for lethal force against, suspect who may or may not have had a knife in his hand when suspect had earlier displayed and attacked with the knife). Rather than making “allowance for the fact that police officers are often forced to make split-second júdgments—in circumstances that are tense, uncertain, and rapidly evolving,” Graham, 490 U.S. at 397, 109 S.Ct. 1865, the majority has instead engaged in the type of “armchair reflection,” we used to decry, Elliott, 99 F.3d at 642. At the time Hensley descended the stairs and advanced, Deputy Beasley was trapped in his car and Lieutenant Price had already witnessed Hensley use the gun as a weapon against Rachelle. There was every reason to believe that Deputy Beasley was in imminent threat. B. After erroneously concluding that the Deputies violated Hensley’s right to' be free from excessive force, the majority avoids ruling upon whether they are entitled to qualified immunity, instead finding that the Deputies waived the issue. 1. To begin, I disagree with the majority’s assertion that the Deputies waived the argument that their actions did not violate any clearly established rights. Although the Deputies could have been more precise, in' their brief they note that “the Court must determine two issues: 1) did the Defendants violate Hensley’s constitutional rights; and 2) if so, was it clearly established at the timé that the Defendants [sic] "conduct was unconstitutional,” Appellant’s Br. at 14, and that “[b]oth questions must be answered yes for the Plaintiffs to proceed,” Appellant’s Br. at 15. In addition, the history of this case before our court indicates the Deputies did not waive their argument. After the Deputies filed their opening brief, the Appellees moved to dismiss the appeal as interlocutory. The Appellees did not argue that the Deputies had waived step two, but that the Deputies were arguing about fact disputes instead of legal questions. In responding to the motion, the Deputies again made clear that “[a]s, argued in their Brief, even viewing the facts in the light most favorable to the Appellees, the Defendant Officers did not violate any constitutional right and even if they did, it was not clearly established at the time.” Appellant’s Response at 4, ECF No. 35 (emphasis added). With the benefit of that explanation, a'panel of this court denied the motion to dismiss. Finally, the Deputies timely filed a letter under Federal Rule of Appellate Procedure 28(j) after the Supreme Court issued its decision in White v. Pauly, — U.S. -, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017). In the 28(j) letter, the Deputies explained: White is relevant as plaintiff has failed to point to ‘clearly established law’ that was violated, with a factually similar case. Plaintiff relies on Pena v. Porter which, describes very different circumstances—the officers were looking for a suspect that was not Pena, went to Pena’s home in the middle of the night and saw him sleeping; he came to the door in response to knocks, holding a shotgun, and they immediately shot and killed him. The officers did not receive a 911 call regarding Pena, witness him hit his daughter in the head with a gun and advance on officers with a gun. Appellant’s Supplemental Authorities at 1, EOF No. 37. These actions sufficiently put the issue of whether the right was clearly established before this court. The majority concludes otherwise, and then, hoping to avoid the practical problem that the Deputies could raise qualified immunity again immediately on remand and file another interlocutory appeal, see Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (holding that defendant may bring more than one interlocutory appeal based on qualified immunity), proclaims that the mandate rule precludes the Deputies from raising step two again until “an appropriate time at trial,” because the mandate rule “ ‘restricts the district court’s authority’ to reconsider that issue in a summary judgment proceeding.” Majority Op. at 580 n.5 (quoting Doe v. Chao, 511 F.3d 461, 465 (4th Cir. 2007)). I do not believe the mandate rule operates to restrict the Deputies from raising qualified immunity again immediately on remand, but, to the extent the majority holds otherwise, I agree that the Deputies can (and should) pursue qualified immunity at trial. Moreover, even if the Deputies did waive the argument that the law was not -clearly established, I would still reach the issue. The majority speaks of waiver in absolute terms but, because waiver is judicially created, “we possess the discretion under appropriate circumstances to disregard the parties’ inattention.” United States v. Holness, 706 F.3d 579, 592 (4th Cir. 2013).- Factors we examine in determining whether to use this discretion include whether the record is sufficiently developed to permit us to examine the issue and whether addressing the issue would “enhanc[e] the efficiency of the deci-sionmaking process” and; conserve “judicial resources.” Id. Although we have never decided if a “party may truly waive waiver,” we have used our discretion to excuse a “supposed waiver” when the waiver argument is raised in an untimely fashion. United States v. Ashford, 718 F.3d 377, 380 (4th Cir. 2013) (internal quotation marks and alterations omitted). After all, “waiver must be a two-way street.” Id. at 381. Here, the Plaintiffs have not argued that the Deputies waived step two, the summary judgment record is adequate to decide the issue, and a ruling would streamline proceedings by, as explained below,'correcting the district court’s erroneous recitation and application of the qualified immunity standard. To be clear, the majority is sua sponte concluding that the Deputies waived this argument. The Plaintiffs did not raise waiver in their brief. To the contrary, their brief at several points discusses whether Hensley’s right was clearly established. See, e.g., Appellees’ Br. at 18 (“An objectively reasonable officer should know that shooting a man who was carrying a gun pointing down to the ground on his -own property, in a State with open-carry laws, and not raising it in a threatening manner violates the Fourth Amendment. The second prong of the qualified immunity analysis requires the Court to examine whether [the Deputies] violated a clearly established right.”)- -' -' In my view, the Plaintiffs waived the Deputies’ alleged waiver “by addressing the claim on the merits without also making a waiver argument.” Norwood v. Vance, 591 F.3d 1062, 1068 (9th Cir. 2010). Instead of reaching this common sense conclusion, the majority is choosing to affirm “on a ground that neither” party “had any reason to believe might dispose” of the Deputies’ qualified immunity argument, Rohan v. Networks Presentations LLC, 375 F.3d 266, 288 (4th Cir. 2004) (Shedd, J., dissenting). Their actions represent, the harshest use of the waiver rule I can remember during my time on the court. 2. . ■ The majority’s faulty waiver ruling is made more troubling by the simple fact, that the district court, in my view, erred in analyzing whether the right at issue was clearly established. ■ The court accepted Gamer as the clearly established law and then collapsed qualified immunity’s two steps: The Plaintiffs asserts [sic] that the Defendants’ alleged harmful conduct— Price and Beasley’s unreasonable use of deadly force to ‘seize’ the decedent—was conduct clearly proscribed by the Constitution, While a police officer’s interaction with a person may or may not ultimately lead to the person’s seizure in a constitutional sense, “there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.” Tennessee v. Garner, 471 U.S. 1, 7 [105 S.Ct. 1694, 85 L.Ed.2d 1] (1985). Therefore, if the, forecast of evidence would support a jury finding that the deputies’ use of deadly force was unreasonable, then both prongs of the pertinent test have been met. Hensley, 167 F.Supp.3d at 761-62 (emphasis added). . In other words, the court found that the Plaintiffs only had to prove that the Deputies used excessive force, because the prohibition against using excessive force is clearly established. The Supreme Court has consistently explained the error in this approach; We have repeatedly told courts not to define clearly established law at a high level of generality. The dispositive question is whether- the violative nature of ¡particular conduct is clearly established. , This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Mullenix, 136 S.Ct. at 308 (internal alterations, citations, and quotation marks omitted). More recently, again in the context of deadly force, the White Court explained that “we have held that Gamer and Graham do not by themselves create clearly established law outside an obvious case.” White, 137 S.Ct. at 552 (internal quotation marks omitted). This case is simply not an “obvious” case where Gamer and Graham apply and, accordingly, the district court committed error in so holding.[8] As a résult of the majority’s determination of the mandate, that error is now crystalized in the ease. III. “The public interest ... includes the substantial public concern for the safety of police officers lawfully carrying out the law enforcement effort.” United States v. Sakyi, 160 F.3d 164, 167 (4th Cir. 1998). Today, this court takes yet another step in minimizing that concern and continues its “significant departure from the precedent of this Court and the Supreme Court.” Henry, 652 F.3d at 553 (Shedd, Circuit Judge, dissenting). Collectively, our jurisprudence continues to raise the specter of a chilling effect on police conduct, “prompting law enforcement officers to choose inaction in order to avoid risking personal liability.” Id. Before today, when confronted by an armed person who had just committed a violent crime and was advancing towards them, an officer was entitled to believe that they were under imminent threat. Now, however, under the majority’s rule, unless and until the officer has either issued a warning or waited for the armed individual to aim his weapon, further compounding the risk of officer harm, the officers must pause before taking action or face § 1983 liability. Because neither caselaw from our Court nor the Supreme Court supports § 1983 liability in such circumstances, I dissent.[9] . Like the majority, I refer collectively to Lieutenant Michael Price and Deputy David Beasley as "the Deputies.” . There is no dispute that Hensley knew the vehicles were police cars. . Lieutenant Price testified that he did not issue a command because events were unfolding “so fast” and he found that he “couldn't say nothing” because he was so frightened by the situation. (J.A. 546). It is difficult to imagine a trained officer being that scared if he did not perceive that he was facing an extremely dangerous situation. Deputy Beasley was still lying down in the front seat of his car and did not see Hensley's altercation with Rachelle. . The Deputies both testified that Hensley was aiming, the weapon at Deputy Beasley and attempted to cock or fan the hammer on the revolver at the time they decided to shoot. While, this information provides fuller context to the Deputies' testimony, for purposes of our review, we accept the district court’s crediting of H.H. and Rachelle’s testimony that Hensley’s hands were at his sides at the time of the shooting, . In light of my conclusion that the Deputies are entitled to summary judgment on the excessive force claim, I would also reverse on the two state law claims addressed by- the majority. . Incredibly, the majority views Hensley’s discarding of Rachelle after hitting her and walking toward Deputy Beasley's patrol car as ending the threat. At this point, a reasonable officer would have perceived Hensley’s actions as escalation not diminution: an armed Hensley who had already committed an assault in the Deputies’ presence was heading directly toward a physical encounter with the police. . The majority makes much of the fact that the Deputies did not warn Hensley before firing. Garner provides that, in determining whether deadly force is permissible courts should consider if it was feasible to give a warning. 471 U.S. at 12, 105 S.Ct. 1694. As the majority recounts, a warning is not feasible where "the hesitation involved in giving a warning could readily cause such a warning to be” the Deputies’ last. McLenagan v. Karnes, 27 P.3d 1002, 1007 (4th Cir. 1994). Given the imminent threat to Deputy Beasley, a reasonable officer would not have believed a warning was necessarily feasible. . Apart from Gamer and Graham, the district court pointed only to an unpublished disposition, Pena v. Porter, 316 Fed.Appx. 303 (4th Cir. 2009). The majority adds, and misreads, Cooper, but that case was decided after the events here and cannot provide the clearly established law the Court requires. . Although I understand that police confrontations are under increased scrutiny, and a new framework to assess proper officer conduct could evolve from this scrutiny, we are bound by the law as currently propounded by the Supreme Court.