In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3380

THERESA MASON-FUNK,

*Plaintiff-Appellant,*

*v.*

CITY OF NEENAH, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:16-cv-00978-WCG — **William C. Griesbach**, *Chief Judge.*

ARGUED MAY 17, 2018 — DECIDED JULY 10, 2018

Before BAUER, EASTERBROOK, and MANION, *Circuit Judges.*

BAUER, *Circuit Judge.* Brian Flatoff's decision to take individuals hostage at a motorcycle shop in Neenah, Wisconsin, had tragic consequences for Michael Funk. After managing to escape from Flatoff, Funk was shot and killed in the alleyway behind the shop by two officers of the Neenah Police

Department (NPD), Craig Hoffer and Robert Ross. Unfortunately, they mistakenly believed Funk was Flatoff.

Funk's wife, Theresa Mason-Funk, brought this lawsuit under 42 U.S.C. § 1983 against Officers Hoffer and Ross, as well as the City of Neenah (collectively, Defendants), alleging that both officers used unreasonable and excessive force against Funk. The district court granted summary judgment in favor of Defendants, finding that the officers' conduct was not objectively unreasonable under the Fourth Amendment, and that even if their conduct was unreasonable, they were shielded from liability by qualified immunity. We conclude that the qualified immunity issue is dispositive and affirm.

## I. BACKGROUND

At approximately 8:35 a.m. on December 5, 2015, Flatoff entered Eagle Nation Cycles in Neenah, Wisconsin, with a MAC-10 machine pistol and took four individuals in the shop, including Funk, hostage. Flatoff had a dispute with an individual named Vance Dalton, and demanded that he come to the shop. Winnebago County Dispatch notified the NPD about the hostage situation. Numerous officers from the NPD reported to the scene, including Lieutenant Shawn O'Bre; Officer Jonathon Kuffel, the SWAT team leader; Officer Hoffer, the assistant SWAT team leader; and Officer Ross. Officers from other jurisdictions also assisted the NPD.

Officer Ross received radio communications from the primary dispatcher. He was provided with information that there were three hostages, that Flatoff's gun was a MAC-10, and that he was a white male with long hair and a plaid jacket. Officer Hoffer received his information about the situation

through other SWAT team members who used an encrypted SWAT team radio channel.

When Lieutenant O'Bre arrived at the scene he instructed the officers to set up a perimeter around the shop. The shop had a main entrance on Main Street and a rear entrance in an alley behind Main Street. Flatoff's truck was parked in the alley near the rear entrance. The officers positioned themselves and their vehicles on both sides of the alley. Lieutenant O'Bre also formed a "hasty response" team to enter the shop, rescue the hostages, and neutralize Flatoff. Officer Kuffel was in command of the hasty team, which included both Officers Hoffer and Ross. The hasty team became critically necessary by 9:21 a.m., as Flatoff stated that if Dalton did not show up in the next five minutes, he would start shooting. Although no shooting occurred, at 9:39 a.m., Flatoff repeated this threat, saying everyone inside the shop would die if Dalton did not show up in the next minute.

Based on these threats, Officer Kuffel determined that the hasty team needed to enter the shop. The hasty team formed a "stack" in the following order: (1) Lieutenant Tyrone Thompson; (2) Lieutenant O'Bre; (3) Officer Hoffer; (4) Officer Kuffel; (5) Officer Ross. The team proceeded through the rear entrance in its stack formation at 9:42 a.m., and upon entry, yelled to Flatoff and the hostages "Police," "get down, get down, get down on the ground right now," and "let me see your hands." When Funk dropped to the floor, Flatoff maneuvered behind Funk and fired at the hasty team. Officer Hoffer's helmet was struck with a bullet above his right eye, and another bullet hit a fire extinguisher obstructing the hasty team's vision. The hasty team exchanged some gunfire, but ultimately retreated

one minute after their initial entry. Only the first four members of the hasty team made their way into the shop.

After retreating from the shop, Officers Hoffer and Ross moved to the east end of the alley, while Lieutenants O'Bre, Thompson, and Officer Kuffel went to a parking lot west of the rear entrance to the shop. Officer Hoffer believed that the hasty team had been ambushed and that there were no hostages, based on the large volume of gunfire and the lack of movement to police commands by the hostages.

At 9:45 a.m., only minutes after the hasty team had retreated from the shop, Flatoff instructed Funk to close the rear door which the hasty team had left open, and warned Funk that he would shoot him if he tried to escape. Funk went to close the door, but immediately ran outside and dove to the ground near the rear entrance as Flatoff fired bullets in his direction. Officers Ross and Hoffer heard the shots fired at Funk, and assumed a position on the east side of the alley in view of the rear entrance.

The next sequence of mere seconds was captured on a police dashcam from one of the vehicles facing the alley. Funk took cover on the ground near Flatoff's truck that was parked in the alley, and eventually stood up to maneuver around the truck. While moving around the truck, Funk retrieved a silver-colored handgun from his waistband holster, and held it with both hands in a lowered position. Funk crouched near the bed of the truck, maintaining his sight on the rear entrance. At this point, Officers Hoffer and Ross spotted Funk with a handgun in his possession. Within seconds of the officers spotting someone armed near the truck, Funk turned counter-clockwise

away from the rear entrance and ran across the alley. As Funk ran across the alley, Officers Hoffer and Ross fired at him, striking him in the hip and continually shooting at him as he fell to the ground. Over a five-second period of shooting, Officer Hoffer fired eight shots, hitting Funk twice, and Officer Ross fired eleven shots, hitting Funk five times.

Neither Officer Hoffer, Officer Ross, nor any other member of law enforcement gave warnings to Funk as he ran across the alley. Funk died as a result of his gunshot wounds.

His wife, both individually and in her capacity as the personal representative of Funk's estate, brought this lawsuit under 42 U.S.C. § 1983, alleging a Fourth Amendment violation of excessive force, as well as claims for battery and loss of society and companionship under Wisconsin's wrongful death statute. The district court granted summary judgment in favor of Defendants. *Mason-Funk v. City of Neenah*, 296 F. Supp. 3d 1006 (E.D. Wis. 2017). The court found that Officer Hoffer and Ross did not use objectively unreasonable force. *Id.* at 1011–16. Even if the officers had used unreasonable force, the court concluded they were entitled to qualified immunity because the officers did not violate a clearly established right. *Id.* at 1016–22. Finally, the court did not retain jurisdiction over the state law claims and dismissed them without prejudice. *Id.* at 1022.

## II. DISCUSSION

Summary judgment is appropriate if the moving party has shown there is "no genuine dispute as to any material fact," and is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). We review a grant of summary judgment

*de novo*, construing all factual disputes and drawing all reasonable inferences in favor of the non-moving party. *Kemp v. Liebel*, 877 F.3d 346, 350 (7th Cir. 2017).

Defendants contend that they are entitled to qualified immunity from the excessive force claims. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). In determining whether an official is entitled to qualified immunity, we examine (1) whether "the official violated a statutory or constitutional right," and (2) whether "the right was 'clearly established' at the time of the challenged conduct." *Id.* at 735. We have discretion to choose which prong to address first, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), and since the second prong is dispositive here, we address only whether the right at issue was clearly established.

A right is "clearly established" when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The Supreme Court has reiterated time and again that demonstrating a clearly established right does not require pointing to a case directly on point, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela*, 138 S. Ct. at 1152 (quoting

*White*, 137 S. Ct. at 551). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 136 S. Ct. at 308 (internal quotation marks and citation omitted).

Moreover, the Supreme Court has cautioned lower courts "not to define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela*, 138 S. Ct. at 1152 (quoting *Mullenix*, 136 S. Ct. at 308). Excessive force cases always depend on the particular facts at hand, and accordingly, "police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* at 1153 (internal quotation marks and citation omitted).

Finally, we note that "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Id.* (quoting *White*, 137 S. Ct. at 552). In both *Tennessee v. Garner*, 471 U.S. 1 (1985), and *Graham v. Connor*, 490 U.S. 386 (1989), the Supreme Court addressed the constitutionality of excessive and deadly force. In *Garner*, the Court held that "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." 471 U.S. at 11. Then in *Graham*, the Court held that evaluating the reasonableness of an officer's use of force "requires careful attention to the facts and circumstances of each particular case,

including … whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." 490 U.S. at 396. However, since these two decisions, the Supreme Court has made clear that "*Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 552).

Mason-Funk argues that existing case law put Officers Hoffer and Ross on notice that their conduct and use of deadly force was unconstitutional. More specifically, she contends that the officers were on notice (1) that they had a constitutional obligation in hostage situations to protect innocents and distinguish between the suspect and innocents; (2) that Funk's conduct did not create an imminent threat justifying the use of deadly force; and (3) that deadly force may not be used without providing a warning, except in extraordinary circumstances.

We first examine Supreme Court precedent and precedent from this Circuit to determine whether a right was clearly established at the time of violation. *Gill v. City of Milwaukee*, 850 F.3d 335, 341 (7th Cir. 2017). Mason-Funk relies on *Garner* for the second and third propositions above—deadly force is only permissible when the suspect poses a threat of imminent harm to the officers or others, 471 U.S. at 11, and deadly force may be used to prevent an escape only "if, where feasible, some warning has been given." *Id.* at 11–12. But Mason-Funk admits that *Garner* alone does not create clearly established precedent and that this is far from the obvious case where it might create such precedent.

In support of *Garner*'s general rules, Mason-Funk directs us to decisions where courts denied qualified immunity to officers who used deadly force on an armed suspect despite not being in imminent harm. In *Weinmann v. McClone*, we held that existing precedent established that a suicidal person sitting with a gun across his lap, who had not threatened an officer with any harm, had the right to be free from the use of deadly force. 787 F.3d 444, 451 (7th Cir. 2015). The Fourth Circuit in *Cooper v. Sheehan* stated that "mere possession of a firearm by a suspect is not enough to permit the use of deadly force," and held that it was clearly established that deadly force could not be used when an armed individual posed no threat to the officers, made no sudden movements, and ignored no commands. 735 F.3d 153, 159–60 (4th Cir. 2013). The court in *Cooper* also noted that the officers never identified themselves. *Id*. at 159. Finally, in *Baker v. Putnal*, the Fifth Circuit declined to apply qualified immunity when an officer, responding to gunshots, on a beach used deadly force on an armed individual who made no threatening movements and merely turned in the officer's direction. 75 F.3d 190, 198 (5th Cir. 1996).

In arguing that Officers Hoffer and Ross were on notice to distinguish between innocents and suspects, and to provide a warning in a hostage situation, Mason-Funk cites *Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001). That case involved the Ruby Ridge hostage situation where an FBI officer mistakenly killed the suspect's wife with a sniper rifle. 253 F.3d at 362–64. However, as noted in the citation, that opinion was vacated as moot, and a vacated opinion can hardly be said to have clearly established any constitutional right. Finally, Mason-Funk relies on a handful of

district court opinions involving hostage situations to support *Horiuchi*, but "district court decisions have no weight as precedents and therefore cannot *clearly* establish a constitutional right," *Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007).

No existing precedent squarely governs the facts and circumstances that confronted Officers Hoffer and Ross. *See Kisela*, 138 S. Ct. at 1153. Consequently, the officers were not on notice that their use of deadly force on an armed individual, without warning in a dangerous and chaotic hostage situation, violated any clearly established right. Funk fails to cite to any precedent, outside of a vacated Ninth Circuit opinion and a handful of district court cases, which involved a hostage situation. On this basis alone, the remaining cases cited by Funk are factually distinct and incapable of giving the officers any fair warning that they violated a clearly established right.

In the circuit cases cited by Funk, the individuals armed with guns did not pose an imminent threat to the officers based on the context of those confrontations. However, the backdrop here to the officers' use of deadly force was an active and dangerous hostage situation, one in which they had been shot at by the hostage-taker. These circumstances, absent in *Garner*, *Weinmann*, *Cooper*, or *Baker*, posed a unique and serious threat to the officers, undermining comparisons to the aforementioned cases.

To drive home the point, it is worth recounting what occurred in the short span of six minutes. Flatoff had continuously made threats that he would kill the hostages, which prompted the hasty team to act. When the hasty team encountered Flatoff inside the shop, Officers Hoffer and Ross were

met with a barrage of gunfire, including a shot that struck Officer Hoffer's helmet in what he believed was not a hostage situation, but rather an ambush. Within minutes of being shot at, the officers heard more gunfire coming from the rear entrance. When Funk appeared in their line-of-sight holding a gun, the officers, in a matter of seconds, concluded that Funk was one of the people inside the shop who had shot at them only minutes ago.

Simply put, the facts in this case and existing precedent failed to put Officers Hoffer and Ross on notice that their use of deadly force, without a warning, on an armed individual in a dangerous hostage situation, was unlawful. The officers did not violate a clearly established right and they are entitled to qualified immunity.

### III.  CONCLUSION

We AFFIRM the district court's grant of summary judgment in favor of Defendants.