**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1294

TERESA ANN HENSLEY, as relator on behalf of the State of North Carolina, and as Administrator of the Estate of David Lee Hensley; H.H., a minor, by and through her parent and next friend; RACHELLE FERGUSON, Individually, and as relator on behalf of the State of North Carolina,

Plaintiffs – Appellees,

v.

MICHAEL SCOTT PRICE, Individually and in his Official Capacity as Lieutenant of Haywood County Sheriff's Department; KEITH ALLEN BEASLEY, Individually and in his Official Capacity as Deputy Sheriff of Haywood County Sheriff's Department; WEST AMERICAN INSURANCE COMPANY, Corporate Surety on the official bond of the Sheriff of Haywood County; THE OHIO CASUALTY INSURANCE COMPANY, Corporate Surety on the official bond of the Sheriff of Haywood County,

Defendants – Appellants,

and

BOBBY R SUTTLES, Individually and in his Official Capacity as former Sheriff of Haywood County; JOHN DOE, #1; JOHN DOE, #2; LARRY BRYSON; DAVID MITCHELL,

Defendants.

Appeal from the United States District Court for the Western District of North Carolina, at Asheville. Martin K. Reidinger, District Judge. (1:14-cv-00193-MR-DLH)

Argued: March 30, 2017                    Decided: November 17, 2017

Amended: November 17, 2017

Before SHEDD, DUNCAN, and AGEE, Circuit Judges.

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Duncan joined. Judge Shedd wrote a dissenting opinion.

Patrick Houghton Flanagan, CRANFILL, SUMNER & HARTZOG, LLP, Charlotte, North Carolina, for Appellants. Russell Lyway McLean, III, MCLEAN LAW FIRM, PA, Waynesville, North Carolina, for Appellees.

AGEE, Circuit Judge:

Deputies Michael Price and Keith Beasley (collectively, the "Deputies")—both employed by the Haywood County, North Carolina, Sheriff's Department—shot and killed David Hensley outside his home on the morning of August 9, 2012. The plaintiffs—Hensley's widow and two daughters—brought suit against the Deputies in both their individual and official capacities under 42 U.S.C. § 1983 and North Carolina law in the United States District Court for the Western District of North Carolina. The Deputies asserted federal qualified immunity and related state defenses in a motion for summary judgment, which the district court denied. For the reasons that follow, we affirm the district court's judgment.[1]

I.

A.

On an interlocutory appeal raising the issue of qualified immunity, the Court views the facts in the light most favorable to the plaintiffs. *Pegg v. Herrnberger*, 845 F.3d 112, 117 (4th Cir. 2017). We summarize the facts viewed in that light as follows, recognizing the Deputies' forecast of evidence is markedly to the contrary.

---

[1] The plaintiffs also sued West American Insurance Co. and The Ohio Casualty Insurance Co., which are also parties to this appeal. The insurance companies concede that under North Carolina law, the plaintiffs' claims against them rise and fall with the claims against the Deputies. *See generally* N.C. Gen. Stat. § 162-8 (requiring sheriff's to be bonded); *White v. Cochran*, 229 S.E.2d 334, 339 (N.C. Ct. App. 2013) (noting that the sheriff may be sued only "where the surety is joined as a party"; collecting cases). Because we affirm the district court's order denying the Deputies immunity from suit, we also affirm the district court's denial of summary judgment to West American and Ohio Casualty.

3

In August 2012, the Deputies[2] responded to a domestic disturbance call at Hensley's home around 6:15 a.m. When the pair arrived, they parked their cars in the front yard and remained in the vehicles facing the home's porch. Shortly thereafter, Hensley; his older daughter, Rachelle Ferguson; and his minor daughter, H.H., walked out of the home and onto the porch together. Hensley held a handgun.

The Deputies noticed the handgun, but took no action—they neither announced their presence nor asked Hensley to drop the gun. Instead, they watched as Hensley briefly struggled with both Ferguson and H.H., striking Ferguson with the handgun. After that altercation ended, the Deputies watched as Hensley walked off the porch and into the yard toward them. When he reached the yard, Hensley looked back at his daughters on the porch. According to plaintiffs' pleadings and proffer of evidence, Hensley still held the handgun with its muzzle pointed at the ground as he descended the porch stairs and walked toward the Deputies.

Throughout this series of events, Hensley and the Deputies did not acknowledge each other's presence. Hensley never raised the gun toward the Deputies or made any overt threats toward them. For their part, the Deputies never ordered him to stop, to drop the gun or issued any type of warning. The Deputies concede that neither of them ever spoke to Hensley.

Shortly after Hensley descended the porch and walked into the yard, the Deputies exited their vehicles and shot and killed him.

---

[2] We refer to the Deputies' conduct jointly here and throughout this opinion because the plaintiffs treat them as one actor.

B.

In July 2014, the plaintiffs—Teresa Ann Hensley (Hensley's wife), in her capacity as administrator of Hensley's estate; Ferguson; and H.H.—filed suit against the Deputies in both their individual and official capacities in the district court. The operative complaint asserted claims against the Deputies for the violation of Hensley's Fourth Amendment right to be free from unreasonable seizure, as enforced by 42 U.S.C. § 1983. As relevant here, the complaint also asserted supplemental claims under North Carolina law, including: (1) assault; (2) negligent infliction of emotional distress, ("NIED"); and (3) wrongful death, pursuant to N.C. Gen. Stat. § 28A-18-2.[3] The plaintiffs sought both compensatory and punitive damages.

After discovery, the Deputies moved for summary judgment, arguing that they were entitled to qualified immunity from the plaintiffs' individual-capacity § 1983 claims on the ground that they acted reasonably in using deadly force. They also contended that they were entitled to public official immunity and related defenses under North Carolina law on the plaintiffs' individual capacity assault, NIED, and wrongful death claims.

---

[3] The district court had original jurisdiction over the plaintiffs' § 1983 claim under 28 U.S.C. § 1331. It had supplemental jurisdiction over each of the plaintiffs' state law claims under 28 U.S.C. § 1367.

The complaint also asserted additional claims under the North Carolina constitution, as well as for the state law tort of intentional infliction of emotional distress. The plaintiffs' voluntarily abandoned their state constitutional claims. The district court granted the Deputies summary judgment on the plaintiffs' intentional infliction of emotional distress claim. Neither claim is at issue in this appeal.

5

Finally, the Deputies argued that, if the court resolved their immunity defenses favorably to them, the plaintiffs' official capacity claims failed as a matter of law.

The district court entered an order denying the Deputies' motion for summary judgment on the issue of qualified immunity, and concluded that:

> [T]he legal question is whether [the] [p]laintiffs' forecast of evidence can give rise to a reasonable inference that the [D]eputies objectively lacked probable cause to believe that [Hensley] posed a threat of serious physical harm to them. Taking the evidence in the light most favorable to the [p]laintiffs, . . . a reasonable jury could conclude that the [Deputies] had no objective basis upon which they could base a decision to use deadly force against [Hensley].

*Hensley v. Suttles*, 167 F. Supp. 3d 753, 762 (W.D.N.C. 2016). The district court also rejected the Deputies' public official immunity defense and other state defenses on the same ground. *Id.* at 766–67.

The Deputies noted a timely appeal. We have jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine. *Winfield v. Bass*, 106 F.3d 525, 528–29 (4th Cir. 1997) ("To the extent that an order of a district court rejecting a governmental official's qualified immunity defense turns on a question of law, it is a final decision within the meaning of § 1291 under the collateral order doctrine[.]"). *See generally Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949).

## II.

The Deputies raise two arguments on appeal. First, they contend that the district court erred in denying them qualified immunity from suit and allowing the plaintiffs' § 1983

6

claim to proceed. Second, the Deputies argue that the district court erred in denying the application of their North Carolina state law defenses.

A.

This Court reviews the district court's denial of qualified immunity *de novo*, taking all the facts in the light most favorable to the non-moving party, here, the plaintiffs. *Pegg*, 845 F.3d at 117. As a practical matter, this means that the Court "accept[s] the facts as the district court articulated them when it determined whether summary judgment was appropriate, and then . . . determine[s] whether, based on those facts, a reasonable person in the [Deputies'] position could have believed that [they] w[ere] acting in conformity with clearly established law at the time." *Id.* We also review the denial of public official immunity and other state law defenses *de novo*. *See Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003).

B.

In reviewing a denial of summary judgment based on qualified immunity, we may only consider whether, on the undisputed facts and the facts considered in the light most favorable to the plaintiffs, the defendants violated clearly established law. *See Iko v. Shreve*, 535 F.3d 225, 233–35 (4th Cir. 2008). In this procedural posture, we may not credit defendant's evidence, weigh the evidence, or resolve factual disputes in the defendants' favor. For example, we may not take as true the Deputies' assertion that once Hensley stepped off the porch he had the muzzle of the gun pointed toward them in a "shoot-from-the-hip" position. Similarly, we may not accept their contention that when Hensley stepped onto the porch he initially pointed the gun at them. While a jury could

7

well believe the evidence forecast by the Deputies, we take the facts in the light most favorable to the plaintiffs to determine the applicable questions of law and ignore any contrary factual claims.[4] *See Mitchell v. Forsyth*, 472 U.S. 511, 528–29 (1985) (observing that the "question of immunity is separate from the merits of the underlying action for purposes of [an interlocutory appeal under the collateral order doctrine] even though a reviewing court must consider the plaintiff's factual allegations in resolving the immunity issue"); *Pegg*, 845 F.3d at 117.

## III.

## A.

We turn first to the Deputies' qualified immunity argument related to the plaintiffs' § 1983 claim.

## 1.

Section 1983 "creates a cause of action against any person who, acting under color of state law, abridges a right arising under the Constitution or laws of the United States." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). In the case at bar, the plaintiffs have alleged that the Deputies violated Hensley's Fourth Amendment right to be free from unreasonable seizures. Even though the plaintiffs have alleged a constitutional violation, the Deputies are "entitled to invoke qualified immunity, which is more than a

---

[4] We note the forecast of most of the relevant evidence in this case is at polar opposites. Indeed, if the *undisputed* evidence were as forecast by the Deputies, they would likely be entitled to qualified immunity. However, that is not the state of the record at the summary judgment stage.

mere defense to liability; it is immunity from suit itself," if they meet the requirements. *Id.*; *see also Mitchell*, 472 U.S. at 526. "Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Under the two-step process set out by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), we may ask "whether a constitutional violation occurred." *Henry*, 652 F.3d at 531. If we conclude that a constitutional violation has occurred, we then examine "whether the right violated was clearly established." *Id.* A right is "clearly established" when "its contours are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cooper*, 735 F.3d at 158 (internal alteration and quotation marks omitted). Although we may exercise our discretion in determining which of the two prongs to analyze first, *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), the Deputies have failed to raise—and, therefore, have waived—any argument that the right at issue was not clearly established. *See* Fed. R. App. P. 28(a)(8)(A) ("[T]he argument . . . must contain . . . appellant's contentions and the reasons for them[.]); *Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999) (noting failure to comply with Rule 28 results in abandonment on appeal).[5] Consequently, we examine only the first *Saucier* prong, "whether a constitutional violation occurred."

---

[5] The dissent disagrees with our waiver analysis. *See* Dissenting Op. § II.B.1. But the Rules of Appellate Procedure are quite clear: "[a brief's argument section] *must contain* . . . [the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the (Continued)

9

record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A) (emphasis added). Appellate courts "are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam). Similarly, it is not our job "to wade through the record and make arguments for either party." *Friedel v. City of Madison*, 832 F.2d 965, 969 (7th Cir. 1987). Here, the Deputies' opening brief contains none of the development required by the rule. It contains no argument on the "clearly established" prong of the qualified immunity test. It contains no citation to cases actually applying the "clearly established" prong of the qualified immunity test. And it contains no citations to the record to indicate that the Deputies preserved the argument below.

The dissent tacitly acknowledges the Deputies' abdication on this point, as it can only muster two instances in which the Deputies mention the second prong of the qualified immunity test in their opening brief. And even then, a cursory reading reveals that they do so only in a boilerplate recitation of the applicable legal standard.

The dissent cannot bolster its faulty waiver analysis by referencing and analyzing irrelevant concerns. For example, the dissent points out that the Deputies referenced the second prong of the qualified immunity analysis in a Rule 28(j) letter. While true, that does not alter our analysis. Nor could it. Under the Rules of Appellate Procedure, waiver is analyzed based on the content of the opening brief; again, "[a brief's argument section] must contain . . . [the] appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). We have held that this rule does *not* allow for preservation where an argument is raised for the first time in a reply brief. *See A Helping Hand, LLC v. Balt. Cty.*, 515 F.3d 356, 369 (4th Cir. 2008). It follows all the more strongly that a Rule 28(j) letter, filed after even the reply brief, is a wholly inappropriate and ineffectual means of preserving an argument on appeal. In fact, we have so held: "We do not countenance a litigant's use of Rule 28(j) as a means to advance new arguments couched as supplemental authorities." *United States v. Ashford*, 718 F.3d 377, 381 (4th Cir. 2013). Were we to treat Rule 28(j) as an independently sufficient means of advancing an argument not raised in the briefs we would run "the risk of [issuing] an improvident or ill-advised opinion . . . on an unbriefed issue." *Ashford*, 718 F.3d at 381. Thus, by failing to preserve the issue in their opening brief, the Deputies waived it. No subsequent filing can revive it.

Our dissenting colleague also overstates the perceived inefficiency of finding a waiver at this stage. As the dissent sees it, the Deputies could raise the second prong of the qualified immunity test again on remand, which they could then appeal. That construct, however, contravenes the operation of the mandate rule. The mandate rule is a "specific application of the law of the case doctrine" that "forecloses relitigation of issues expressly or impliedly decided by the appellate court" on remand. *United States v. Bell*, 5 F.3d 64, 66 (4th Cir. 1993). To be sure, the Deputies may again raise qualified immunity at an appropriate time at trial, but the mandate rule prohibits a "do-over" at the summary judgment stage. *See Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005) ("Thus, while the purely legal question of whether the constitutional right at issue was clearly established is always capable of decision at the summary judgment
(Continued)

That inquiry asks: when viewing the facts in the light most favorable to the plaintiffs, did the Deputies violate Hensley's Fourth Amendment right to be free from unreasonable seizures when deadly force was exercised against him? "The use of deadly force is a seizure subject to . . . the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). "A reasonable officer is entitled to use deadly force where [he] has probable cause to believe that a suspect poses a threat of *serious physical harm*, either to [himself] or to others." *Cooper*, 735 F.3d at 159 (internal alterations and quotation marks omitted) (emphasis added). To determine whether such probable cause existed here, we ask whether the Deputies' use of deadly force was "objectively reasonable in light of the facts and circumstances confronting them, [viewed in the light most favorable to the plaintiffs,] without regard to [the Deputies'] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). We assess the reasonableness of their conduct based on the

---

stage, a genuine question of material fact regarding whether the conduct allegedly violative of the right actually occurred must be reserved for trial.") (internal alterations and quotation marks omitted)); *see also Behrens v. Pelletier*, 516 U.S. 299, 309 (1996) (indicating that a government defendant may raise qualified immunity, once denied, at a subsequent stage of a proceeding because a different legal standard and inquiry governs). But although the Deputies may be able to pursue qualified immunity at a later stage of the proceeding, the mandate rule "restricts the district court's authority on remand" to reconsider that issue in a summary judgment motion. *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007).

Any harshness the waiver rule engenders is offset by its clarity: a party must do more than "take[] a passing shot at [an] issue" to properly preserve it for appellate review. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th 2017). The party must actually "develop [its] argument." *Belk, Inc. v. Meyer Corp.*, 679 F.3d 146, 152 n.4 (4th Cir. 2012). Here, the Deputies' bare recitation of the elements of a qualified immunity defense does not clear that hurdle. They failed to "take a passing shot at the issue." As appellants, they were required to state their "contentions and the reasons for them." Fed. R. App. P. 28(a)(8)(A). This, the Deputies utterly failed to do.

11

totality of the circumstances, *Yates v. Terry*, 817 F.3d 877, 883 (4th Cir. 2016), and based on the information available to the Deputies "immediately prior to and at the very moment they fired the fatal shots." *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) (internal alterations and quotation marks omitted).

With these guiding principles in mind, we turn to the Deputies' argument.

2.

The Deputies contend that the district court erred in denying their motion for summary judgment on the plaintiffs' § 1983 claim because their use of deadly force against Hensley was reasonable under the circumstances. To support their argument, the Deputies maintain that, even viewing the facts in the light most favorable to the plaintiffs, it is clear that Hensley emerged from his home with gun in hand, that Hensley hit Ferguson shortly before coming off the porch and advancing toward them, and that the entire series of events took only a brief time. The Deputies posit that their use of deadly force against Hensley in such circumstances was clearly reasonable because he both demonstrated a propensity for violence and came toward them with a gun.

In rejoinder, the plaintiffs contend that the Deputies acted unreasonably for two reasons. First, the plaintiffs point out that under their version of the facts, when the Deputies killed Hensley, he was pointing the gun at the ground and was threatening neither the Deputies nor his daughters. As the plaintiffs proffer, Hensley's altercation with Ferguson had concluded by the time he walked off the porch; therefore, because he never raised his weapon toward the Deputies, he was not immediately threatening to anyone at the scene. Second, the plaintiffs argue that the Deputies' actions were all the

12

more unreasonable here because they shot without warning Hensley to drop the gun or communicating with him in any way.

At this stage of the proceedings, we must agree with the plaintiffs. If a jury credited the plaintiffs' evidence, it could conclude that the Deputies shot Hensley only because he was holding a gun, although he never raised the gun to threaten the Deputies. Indeed, he never pointed the gun at *anyone*. Moreover, the Deputies had ample time, under the plaintiffs' evidence, to warn Hensley to drop his gun or stop before shooting him, but they concede they never gave any such warning. Because the use of force in such circumstances would be objectively unreasonable, we must affirm the district court's summary judgment order denying the Deputies qualified immunity on the § 1983 claim.

First, if we assume, as we must, the credibility of the plaintiffs' evidence, we cannot say that Hensley posed a threat of serious physical harm to either the Deputies or his daughters at the time the Deputies fired the fatal shot. The lawful possession of a firearm by a suspect at his home, without more, is an insufficient reason to justify the use of deadly force. Indeed, it is unreasonable for an officer to believe "that a suspect poses a threat of serious physical harm, either to [himself] or to others," merely because that suspect *possesses* a firearm. *Cooper*, 735 F.3d at 159 (internal alterations and quotation marks omitted); *see also Pena v. Porter*, 316 F. App'x 303, 312 (4th Cir. 2009) ("Absent any additional factors which would give [officers] probable cause to fear for their safety or for the safety of others, the mere presence of a weapon is not sufficient to justify the use of deadly force.").

13

Under the plaintiffs' version of the facts, this case bears a noteworthy resemblance to our decision in *Cooper v. Sheehan*—another case where law enforcement used deadly force against a non-threatening suspect. There, the officers responded to a domestic disturbance at Cooper's home. *Cooper*, 735 F.3d at 155. Rather than announce their presence, one officer simply "tapped on the window [of Cooper's home] with his flashlight." *Id.* (internal quotation marks omitted). In response, Cooper "peered out the back door" and "called out for anyone in the yard to identify himself," but the officers did not respond. *Id.* Faced with silence, Cooper went outside to investigate the noise and brought with him a twenty-gauge shotgun. *Id.* "With the butt of the firearm in his right hand and its muzzle pointed toward the ground, Cooper opened the back door and took two or three steps on to his darkened porch." *Id.* (internal quotation marks omitted). By that time, the officers were out of Cooper's line of sight; nor could they see him. *Id.* When Cooper came upon the officers, "[r]eacting to the sight of Cooper and his shotgun, the [o]fficers drew their service weapons and commenced firing without warning." *Id.* at 156.

On those facts, we held that the officers' use of deadly force violated Cooper's Fourth Amendment rights because Cooper never raised the shotgun toward the officers and "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Id.* at 159. We reasoned, "an officer does not possess the unfettered authority to shoot a member of the public simply because that person is carrying a weapon." *Id.*

14

So too here. The Deputies responded to a domestic disturbance at Hensley's home, but had no specific information about the situation. When they arrived shortly after dawn, Hensley and his daughters stepped out of the home and onto the porch. Hensley had a handgun, but never raised it toward the Deputies. According to the plaintiffs' evidence, if believed by a jury, Hensley made no threatening statements or actions toward anyone in the moments immediately preceding the shooting. Instead, Hensley stepped off the porch and into the yard, keeping the handgun pointed toward the ground at all times. Nevertheless, almost immediately after he stepped into the yard, the Deputies opened fire on Hensley and killed him without warning. If a jury credited the plaintiffs' version of the facts, it could reasonably conclude that because Hensley never raised the gun to the officers, and because he never otherwise threatened them, the Deputies shot Hensley simply because he had possession of a firearm. As we held in *Cooper*, such conduct violates the Fourth Amendment. *Cf.* 735 F.3d at 158–60.

Moreover, although the plaintiffs admit that Hensley and Ferguson were engaged in a brief altercation on the porch, that fact does not change our calculus. The short struggle between Hensley and Ferguson had little bearing on whether Hensley was prepared to take the substantial step of escalating a domestic disturbance into a potentially deadly confrontation with two armed police officers. Thus, under the plaintiffs' version of the facts, no reasonable officer could have believed that Hensley posed a threat of serious physical harm to the Deputies at the time they used deadly force against him. Nor are we persuaded that Hensley's attack on Ferguson made the Deputies' use of deadly force imperative to protect her from serious physical injury.

15

When the Deputies fired on Hensley, his physical conflict with Ferguson had ended. Hensley had ventured off the porch, away from Ferguson, and out into the yard. *See Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified [in one moment] is not justified even seconds later if the justification for the initial force has been eliminated."). Whether the Deputies could have used deadly force during Hensley's altercation with Ferguson is not at issue here. But assuming the Deputies could have done so, by the time Hensley made it down the steps and into the yard, any "justification for the initial force ha[d] been eliminated." *Id.*[6]

In any event, even if the Deputies reasonably could have believed that Hensley posed a threat of serious physical harm, their failure to warn him—or to order him to drop the gun—before employing deadly force creates an additional impediment. Before an officer may use deadly force, he should give a warning if it is feasible. *See Garner*, 471 U.S. at 11–12 ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, *and if, where feasible, some warning has been given*." (emphasis added)).

---

[6] Our dissenting colleague maintains that no constitutional violation occurred, but cites only generalities and otherwise irrelevant facts to support that conclusion. In cases like this one, we must evaluate all of the facts and circumstances. *Graham*, 490 U.S. at 397. We are not permitted to make credibility determinations or weigh competing evidence. As discussed in detail above, the facts, viewed in the light most favorable to the plaintiffs, suggest that Hensley had walked away from Ferguson and did not threaten serious physical harm against the Deputies at the time they shot him. Nor do we put much stock in the dissent's assertion that Hensley "responded to the[] [Deputies'] presence by immediately retrieving a gun and coming outside to confront them." Dissenting Op. 33. While true that Hensley retrieved the gun in response to the Deputies' presence, that fact was not known to them at the time the fatal shot was fired. Consequently, that fact is irrelevant to our analysis. *Greenidge*, 927 F.2d at 792.

16

We have reasoned that a warning is not feasible if "the hesitation involved in giving a warning could readily cause such a warning to be [the officer's] last." *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994); *see also id.* (noting that, there, "a warning might easily have cost the officer his life"); *cf. Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) (holding that an officer's use of deadly force was reasonable when a handcuffed suspect pointed a small handgun at him and the officer ordered the suspect to drop his weapon, which the suspect ignored). More simply put, an officer should give a warning before using deadly force unless there is an immediate threatened danger.

Because a jury crediting the plaintiffs' version of the facts could conclude that the Deputies were not in any immediate danger when they fired their weapons, the failure to warn Hensley also weighs against them. In the moments leading up to the fatal shooting, the Deputies watched Hensley descend the steps from the porch into the yard. They watched him pause and look back to the house. And they briefly watched as Hensley walked toward them. While this scene played out in front of them, the Deputies concede they never ordered Hensley to drop the gun or warned that they would shoot. While we have no doubt the circumstances confronting the Deputies were tense and fast moving, that fact alone does not obviate *Garner*'s warning admonition.

The Deputies contend that none of the reasons noted above are a sufficient basis upon which to affirm the district court's denial of qualified immunity. To support their argument, they direct us to four cases in which we extended qualified immunity to officers who used deadly force: *Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); *Sigman v. Town of Chapel Hill*, 161 F.3d 782 (4th Cir. 1998); *Elliott*, 99 F.3d 640; and

17

*Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991). According to the Deputies, these cases compel the opposite result from that reached by the district court. We disagree.

*Anderson* and *Slattery* are factually different from the case at bar in legally significant ways. In *Anderson*, this Court concluded that a Maryland police officer was justified in using deadly force when a subdued suspect repeatedly lowered his hands toward what the officer perceived to be a gun, in violation of the officer's verbal commands. *See* 247 F.3d at 128–29, 130–32. Even though the suspect was merely trying to turn off his Walkman, we observed that "[a]ny reasonable officer in [the officer's] position would have imminently feared for his safety and the safety of others." *Id.* at 131. Likewise, in *Slattery*, we concluded that a Virginia police officer was justified in using deadly force when a suspect in the passenger seat of a stopped car repeatedly lowered his hands toward an object out of the officer's view, in violation of the officer's commands. 939 F.2d at 214–17. Although the object turned out to be a beer bottle, *id.* at 215, this Court held that "a reasonable officer [nevertheless] could have had probable cause to believe that [the plaintiff] posed a deadly threat," *id.* at 216–17.

In both cases, once the officer issued a verbal command, the character of the situation transformed. If an officer directs a suspect to stop, to show his hands or the like, the suspect's continued movement likely will raise in the officer's mind objectively grave and serious suspicions about the suspect's intentions. Even when those intentions turn out to be harmless in fact, as in *Anderson* and *Slattery*, the officer can reasonably expect the worst at the split-second when he acts. Here, the Deputies gave Hensley no command to stop, drop the gun, or raise his hands. Because they gave no warning, the Deputies had

18

no reason to suspect that Hensley posed an immediate threat other than the fact that he was holding a gun that was not pointed at them, but at the ground. Such conduct runs headlong into our holding in *Cooper*: "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force." 735 F.3d at 159.

*Sigman* is similarly unhelpful to the Deputies' position. Hensley's conduct in the moments before his death bears little resemblance to the suspect in *Sigman*. There, we held that a North Carolina police officer was justified in using deadly force against a suspect who, despite the surrounding police officers' commands to stop, advanced on him with a knife. 161 F.3d at 787. Prior to the shooting, the suspect had threatened to kill— at various times—himself, his girlfriend, and the officer. *Id.* at 784–85, 787. The suspect also had swung a knife at the officer through an open window in his home. *Id.* On those facts, we approved the use of deadly force because the suspect "was willing to use his knife on others," had made threats on the officer's life, and did not obey the officer's commands to stop. *Id.* at 787.

In *Elliott*, the defendant officers shot and killed a suspect who, while restrained in handcuffs in a police car, pointed a gun at them and ignored the officers' order to drop the weapon. *See* 99 F.3d at 642–43. The facts here, when viewed most favorably to the plaintiffs, also bear no resemblance to the facts of *Elliott*. Hensley never pointed the gun at the Deputies nor received a command to stop or drop the gun.

In sum, we conclude that the district court correctly denied the requested grant of qualified immunity. If a jury were to credit the plaintiffs' evidence, it could conclude that Hensley never raised the gun, never threatened the Deputies, and never received a

19

warning command. In that circumstance, the Deputies were not in any immediate danger and were not entitled to shoot Hensley. Under those circumstances, the Deputies are not entitled to qualified immunity.

B.

We next address the Deputies' arguments as to the plaintiffs' state law claims.

1.

The Deputies first argue that the plaintiffs' assault claim fails as a matter of law, relying principally on the arguments they advanced in support of their qualified immunity defense.[7] We disagree.

Under North Carolina law, a plaintiff may maintain a civil action for assault arising from an arrest if it is accomplished by excessive force. *See Myrick v. Cooley*, 371 S.E.2d 492, 496 (N.C. Ct. App. 1988).[8] "Although the officer has discretion, within

---

[7] While the district court's denial of summary judgment on the plaintiffs' assault claim is not ordinarily immediately appealable under the collateral orders doctrine, we nevertheless may exercise appellate jurisdiction under the doctrine of pendent appellate jurisdiction. Pendent appellate jurisdiction is "a judicially-created, discretionary exception to the final judgment requirement." *Rux v. Republic of Sudan*, 461 F.3d 461, 475 (4th Cir. 2006). This exception is "narrow" and applies only "(1) when an issue is inextricably intertwined with a question that is the proper subject of an immediate appeal"; or (2) "when review of a jurisdictionally insufficient issue is necessary to ensure meaningful review of an immediately appealable issue." *Id.* (internal quotation marks omitted). Claims are "inextricably intertwined if the same specific question will underlie both the appealable and the non-appealable [claims], such that resolution of the question will necessarily resolve [both claims] at once." *Scott v. Fam. Dollar Stores, Inc.*, 733 F.3d 105, 111 (4th Cir. 2013). Here, because our analysis of the assault claim turns entirely on our analysis of the Deputies' qualified immunity defense, the Deputies' challenge to that claim is "inextricably intertwined" with that defense.

[8] We note that the issue of whether public official immunity can apply to intentional tort claims, like the plaintiffs' assault claim, splits courts in North Carolina. *Compare, e.g.*, *Hawkins v. State*, 453 S.E.2d 233, 242 (N.C. Ct. App. 1995) (holding that public official immunity does
(Continued)

reasonable limits, to judge the degree of force required under the circumstances, when there is substantial evidence of unusual force, it is for the jury to decide whether the officer acted as a reasonable and prudent person or whether he acted arbitrarily and maliciously." *Id.* (internal quotation marks omitted). "The question of whether an officer has used excessive force is judged by a standard of objective reasonableness." *Jordan v. Civil Service Bd.*, 570 S.E.2d 912, 917 (N.C. Ct. App. 2002) (internal alteration and quotation marks omitted).

As previously noted, the facts taken in the light most favorable to the plaintiffs show that the Deputies' conduct was not objectively reasonable. The evidence viewed in that light indicates that the Deputies shot Hensley under no imminent threat and without warning. Thus, the district court correctly concluded that plaintiffs' assault claim could proceed as a matter of law.

2.

We next address the Deputies' assertion that they are entitled to public official immunity under North Carolina law on the plaintiffs' NIED and wrongful death claims, as well as on the issue of whether they would be able to seek punitive damages in

---

not apply to intentional tort claims), *with Campbell v. Anderson*, 576 S.E.2d 726, 730 (N.C. Ct. App. 2003) (concluding otherwise). In an unpublished decision, we previously have applied public official immunity to intentional tort claims. *See Ayala v. Wolfe*, 546 F. App'x 197, 202 (4th Cir. 2013). Because we resolve the assault claim on the same reasoning used by the district court, it is unnecessary to address the application of the public official immunity bar as it relates to this claim.

conjunction with their state tort claims.[9]  Public officials in North Carolina usually are immune from suit for actions taken in their official capacities.  *See Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984).  A deputy sheriff carrying out his duties is such a public official.  *See Messick v. Catawba Cty.*, 431 S.E.2d 489, 496 (N.C. Ct. App. 1993), *abrogated on other grounds by Boyd v. Robeson Cty.*, 621 S.E.2d 1 (N.C. Ct. App. 2005).  Thus, the Deputies would be entitled to public official immunity so long as they did not act (1) "outside the scope of [their] official authority," (2) with malice, or (3) in a corrupt manner. *Wilcox v. City of Asheville*, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012).

Before the district court, the plaintiffs argued that the Deputies acted with malice.  Public official immunity "is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." *Bailey*, 349 F.3d at 742 (internal quotation marks omitted).  Under North Carolina law, a law enforcement officer has a duty not to use deadly force upon another person unless, among other things, it is "reasonably necessary . . . [t]o defend himself or a third person from what he reasonable believes to be the use or imminent use of deadly physical force [or] [t]o effect an arrest[.]" N.C. Gen. Stat. § 15A-401(d)(1)–(d)(2).

Once again, taking the evidence in the light most favorable to the plaintiffs, the district court correctly denied the Deputies public official immunity because the use of

---

[9]  We have jurisdiction over the Deputies' interlocutory appeal of the public official immunity issue under the collateral order doctrine because, under North Carolina law, public official immunity, like qualified immunity, "is an immunity from suit." *Bailey*, 349 F.3d at 738–39.

22

deadly force was not reasonably necessary under the circumstances.[10]  Under that view of the evidence, the Deputies shot Hensley despite the fact that he posed no immediate threat of serious harm to either them or his daughters.  Hensley simply walked down the porch stairs and into the yard with his gun pointed toward the ground.  The Deputies then shot Hensley without any warning.  The evidence so construed could lead a jury to reasonably conclude that the Deputies acted with malice under North Carolina law.

Accordingly, we must conclude at this stage of the proceedings that the Deputies acted contrary to their duty to use deadly force only when reasonably necessary.  In that circumstance, the Deputies are not entitled to public official immunity under North Carolina law.

IV.

For these reasons, we conclude that the district court appropriately denied the Deputies qualified immunity on the plaintiffs' § 1983 claim and state law assault claim, as well as public official immunity on their NIED, wrongful death and punitive damages claims brought under North Carolina law.  The judgment of the district court is

*AFFIRMED.*

---

[10]  Here too, the Deputies have waived any argument that the violation at issue here was not "clearly established."

23

SHEDD, Circuit Judge, dissenting:

Reasonableness under the Fourth Amendment "is evaluated from the perspective of the officer on the scene, not through the more leisurely lens of hindsight." *Abney v. Coe*, 493 F.3d 412, 416 (4th Cir. 2007). Today's decision, however, continues the shift that began in *Henry v. Purnell*, 652 F.3d 524 (4th Cir. 2011) (en banc), where "judge[s] engage[] in post hoc evaluation of police conduct . . . [and] imagine some alternative means by which the objectives of the police might have been accomplished." *United States v. Sharpe*, 470 U.S. 675, 686-87 (1985). Here, the majority has transformed a chaotic series of events that took place in a matter of seconds into a routine police call whereby, if only the Deputies[1] had acted as the majority would prefer, perhaps David Lee Hensley might still be alive. While Hensley's death is a tragedy, tragedy does not equal liability. When the undisputed facts are judged from the Deputies' perspective, it becomes apparent that they did not violate Hensley's constitutional rights. Moreover, even assuming otherwise, the district court erred in determining if the Deputies violated clearly established law. Therefore, I respectfully dissent.

I.

Just after 6 a.m. on the morning of August 9, 2012, Shirley Ferguson, Hensley's mother-in-law, called 911 to report a possible domestic disturbance at Hensley's home. Hensley had been agitated overnight, telling his daughter Rachelle that they were the only

---

[1] Like the majority, I refer collectively to Lieutenant Michael Price and Deputy David Beasley as "the Deputies."

people left on Earth and asking Rachelle to call his wife and have her come home from work. Hensley also indicated that he wanted to die. When Shirley called to check on Rachelle, Hensley answered and told her he was "going to kill GDB [sic] with a knife" before slamming the phone down. Hensley's behavior during the phone call prompted Shirley's 911 call.

Two Haywood County Sheriff's Deputies, Lieutenant Michael Price and Deputy Keith Beasley, responded to the call. As relayed to the Deputies, the call was a civil disturbance involving a person possibly under the influence of drugs: the subject was on his porch yelling and screaming at someone inside his house. The Deputies drove separate marked vehicles to the residence. As they approached Hensley's home, an elderly man flagged down Lieutenant Price to tell him that Hensley had kept the neighborhood up all night. The dispatcher also called the Deputies to provide an update: Shirley had called 911 a second time and indicated that Hensley may have hurt her granddaughters. As they approached Hensley's residence, Lieutenant Price was the lead car. Lieutenant Price, however, missed the turn for Hensley's driveway; Deputy Beasley thus pulled in first and began proceeding down the driveway.

Inside the house, Hensley saw the police cars approaching, ran into his bedroom, and reached under his mattress to retrieve the key to his gun safe. He then opened the safe and removed a long-nose revolver. Rachelle and her sister, H.H., attempted to stop

25

Hensley, but were unable to do so. All three then exited the house onto the front porch and saw the two police cars in their driveway.[2]

Lieutenant Price and Deputy Beasley were stopped in front of the residence as Hensley and his daughters spilled out onto the porch. Hensley was openly carrying the gun as he exited the house, and both Deputies saw him with the weapon. In response to seeing Hensley with a gun, Deputy Beasley immediately threw himself down across his front seat and put his car in reverse. Because, however, Deputy Beasley could not be sure of Lieutenant Price's location and was concerned about injuring Lieutenant Price, he put his car back into park and remained in a position of cover lying across the front seat. Lieutenant Price radioed, "It's a gun! Gotta gun!" and backed his car further up the driveway. (J.A. 633). Lieutenant Price then exited his vehicle taking a "low ready" position.

At that point, Hensley and Rachelle briefly wrestled for the gun. Hensley won the struggle and struck Rachelle in the back of the head with the gun. Rachelle and H.H. screamed for help from the Deputies, but neither officer issued a verbal command or approached the house.[3] After striking Rachelle with the gun, Hensley let go of her and proceeded down the porch steps. Rachelle testified that, while she did not see Hensley drop the gun, she lost sight of the gun as he left the porch. H.H. testified that the gun was

---

[2] There is no dispute that Hensley knew the vehicles were police cars.

[3] Lieutenant Price testified that he did not issue a command because events were unfolding "so fast" and he found that he "couldn't say nothing" because he was so frightened by the situation. (J.A. 546). It is difficult to imagine a trained officer being that scared if he did not perceive that he was facing an extremely dangerous situation. Deputy Beasley was still lying down in the front seat of his car and did not see Hensley's altercation with Rachelle.

not in Hensley's right hand, but that she could not see his left hand. She also testified that his hands remained by his side as he left the porch. Before Hensley stepped off the porch, he turned to tell H.H. that he loved her.

Hensley left the porch and stepped into the front yard before veering off and walking directly toward Deputy Beasley's car. As Hensley was leaving the porch, Deputy Beasley, afraid that he was going to be trapped in his car, kicked open his vehicle door, exited the vehicle, and began quickly moving to a defensive position at the back of his car further away from the oncoming Hensley. Deputy Beasley saw that Hensley, who was about 30 feet away, was walking toward him with the gun in his hand. Deputy Beasley fired three shots as he continued moving away from the perceived threat. At roughly the same time, Lieutenant Price, concerned that Deputy Beasley was pinned inside his vehicle, fired two shots at Hensley as Hensley headed toward Deputy Beasley's car.[4] Hensley was killed by a single bullet to the head.

North Carolina State Bureau of Investigation Agents recovered a long-nosed revolver, which matched the description of the gun given by the Deputies, from underneath Hensley's body. Following an investigation, no charges were brought against Lieutenant Price or Deputy Beasley. The audio log of the patrol cars' communications

---

[4] The Deputies both testified that Hensley was aiming the weapon at Deputy Beasley and attempted to cock or fan the hammer on the revolver at the time they decided to shoot. While this information provides fuller context to the Deputies' testimony, for purposes of our review, we accept the district court's crediting of H.H. and Rachelle's testimony that Hensley's hands were at his sides at the time of the shooting.

27

shows that less than fifteen seconds elapsed from the time Lieutenant Price stated, "It's a gun! Gotta gun!" to the time shots were fired. (J.A. 633).

Hensley's family (the Plaintiffs) filed this civil action, raising a variety of state and federal claims, including a 42 U.S.C. § 1983 claim for excessive force. Following discovery, the Deputies moved for summary judgment, arguing that they were entitled to qualified immunity. The district court denied the motion. *Hensley v. Suttles*, 167 F.Supp.3d 753 (W.D.N.C. 2016). The court explained that, accepting the Plaintiffs' version of events, Hensley was holding the gun at his side as he exited the porch and began walking toward the Deputies and that, "[i]f the defendant did not point his gun at Beasley as he made his way across the front yard, as Plaintiffs' forecast of evidence shows, then no reasonable officer could have objectively concluded that the decedent was a danger to the deputies' lives or safety warranting the use of deadly force." *Id.* at 763. Given this conclusion, the court then determined that "both prongs of the qualified immunity analysis are satisfied" because "(1) Defendants violated decedent's constitutional rights when they unlawfully seized him . . . through the use of excessive force, and (2) it was clearly established at the time that the deputies could not seize the decedent in the manner in which they did." *Id.* at 764. The Deputies timely appealed.

I would reverse.[5] On these facts, summary judgment is appropriate for the Deputies on the § 1983 claim because they did not violate Hensley's constitutional rights. "We review de novo a district court's denial of summary judgment and qualified immunity, construing all facts in the light most favorable to the nonmovant." *Orem v. Rephann*, 523 F.3d 442, 445 (4th Cir. 2008). For appeals involving qualified immunity, we accept the facts as stated by the district court and determine "whether, based on those facts, a reasonable person in the defendant's position could have believed that he or she was acting in conformity with the clearly established law at the time." *Gray–Hopkins v. Prince George's Cty.*, 309 F.3d 224, 229 (4th Cir. 2002). "In reviewing a district court's decision rejecting a defendant's assertion of qualified immunity, we apply the analysis set forth by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), as modified by the Court's later decision in *Pearson*[*v. Callahan*, 555 U.S. 223 (2009)]." *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014). Pursuant to *Saucier* and *Pearson*, we ask whether the Deputies violated Hensley's constitutional rights and, if so, "whether the right at issue was 'clearly established' at the time of the events in question." *Id.* We may use our "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson*, 555 U.S. at 236.

---

[5] In light of my conclusion that the Deputies are entitled to summary judgment on the excessive force claim, I would also reverse on the two state law claims addressed by the majority.

"Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry*, 652 F.3d at 531. When asking if a right is clearly established at the time of the constitutional violation, we do not ask "whether the right allegedly violated was established 'as a broad general proposition' but whether 'it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted.'" *Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015) (quoting *Saucier*, 533 U.S. at 201–202). The Supreme Court recently reiterated that:

> While this Court's case law "do[es] not require a case directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2016). *In other words, immunity protects "all but the plainly incompetent or those who knowingly violate the law." Id.*

*White v. Pauly*, 137 S.Ct. 548, 551 (2017) (emphasis added).

Here, the Plaintiffs allege that the Deputies used excessive force. Excessive force claims "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The standard is objective, asking if a reasonable officer in the same circumstances would have concluded that the existent threat justified the use of force. *Id.* at 397. A police officer may use deadly force when the officer has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11, (1985).

In applying this standard, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the

30

20/20 vision of hindsight." *Graham*, 490 U.S. at 396. A reviewing court must make "allowance for the fact that police officers are often forced to make split-second judgments [here, certainly so]—in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 397. "The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

## A.

Judging the facts from the perspective of a reasonable officer on the scene, the Deputies did not violate Hensley's constitutional rights by using deadly force. The Deputies were responding to a domestic disturbance call, one that turned out to be extreme even for that category of calls because it involved an armed individual acting irrationally who used force against what appeared to be a close family member in the presence of the police. "[T]he volatility of situations involving domestic violence makes them particularly dangerous. When officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning. Indeed, more officers are killed or injured on domestic violence calls than on any other type of call." *Mattos v. Agarano*, 661 F.3d 433, 450 (9th Cir. 2011) (en banc) (internal quotation marks omitted). While driving to Hensley's residence, the Deputies learned that Shirley had called 911 again to express concern for the safety of her grandchildren. In addition, a neighborhood resident stopped Lieutenant Price to tell him that Hensley had been keeping the neighborhood up the entire night. Thus, a reasonable officer would have

31

known they were approaching a highly volatile situation with an agitated individual and several potential victims.

Upon arriving at Hensley's residence, the Deputies were met by Hensley coming onto the porch openly carrying and displaying a gun. In response to the police presence, rather than attempting to diffuse the situation, Hensley began wrestling with his daughter for control of the gun before striking her in the head with it. At that moment the violence officers fear is lurking at every domestic disturbance call manifested itself before them. Hensley then moved his daughter aside, stepped off the porch, and began walking toward Deputy Beasley's patrol car, closing to within 30 feet.[6]

Less than fifteen seconds elapsed from the time the officers pulled into the driveway until the time the shots were fired. During that time, both officers took defensive positions and postures—like Deputy Beasley throwing himself down on his front seat—that were consistent with their belief that they were seriously under threat and afraid for their lives. A reasonable officer would have believed that Deputy Beasley was under imminent threat of serious physical harm: Hensley began a continuous pattern of aggressive and threatening behavior from the moment the officers arrived and was within 30 feet of Deputy Beasley and armed with a gun—with no suggestion that he was

---

[6] Incredibly, the majority views Hensley's discarding of Rachelle after hitting her and walking toward Deputy Beasley's patrol car as ending the threat. At this point, a reasonable officer would have perceived Hensley's actions as escalation not diminution: an armed Hensley who had already committed an assault in the Deputies' presence was heading directly toward a physical encounter with the police.

32

slowing down or attempting to communicate with the Deputies—at the time the Deputies fired.[7]

*Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013), which the majority relies upon, does not require a different result. In fact, properly read, *Cooper* supports summary judgment for the Deputies. Our holding in *Cooper* rested in part on the fact that Cooper never knew the people on his property were police officers. We noted that, if the officers had made their presence known, a fact undisputed in this case, that "they might have been safe in the assumption that a man who greets law enforcement with a firearm is likely to pose a deadly threat." *Id.* at 159. Thus, *Cooper* supports the Deputies here: they arrived in marked cars that Hensley identified and Hensley responded to their presence by immediately retrieving a gun and coming outside to confront them. Once free of Rachelle, Hensley advanced off the porch and toward Deputy Beasley's marked police car while carrying a gun. Under these facts, the Deputies were "safe in the assumption" that Hensley "pose[d] a deadly threat." *Id. See also Elliott*, 99 F.3d at 644 ("No citizen can fairly expect to draw a gun on police without risking tragic consequences.").

Viewed without 20/20 hindsight, this case falls within the heartland of cases in which we have consistently granted summary judgment to police officers using deadly force. *See*, *e.g.*, *Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("This Circuit has

---

[7] The majority makes much of the fact that the Deputies did not warn Hensley before firing. *Garner* provides that, in determining whether deadly force is permissible courts should consider if it was feasible to give a warning. 471 U.S. at 12. As the majority recounts, a warning is not feasible where "the hesitation involved in giving a warning could readily cause such a warning to be" the Deputies' last. *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). Given the imminent threat to Deputy Beasley, a reasonable officer would not have believed a warning was necessarily feasible.

consistently held that an officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."). *See also Sigman v. Chapel Hill*, 161 F.3d 782, 787-88 (1998) (no constitutional violation for lethal force against suspect who may or may not have had a knife in his hand when suspect had earlier displayed and attacked with the knife). Rather than making "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," *Graham*, 490 U.S. at 397, the majority has instead engaged in the type of "armchair reflection," we used to decry, *Elliott*, 99 F.3d at 642. At the time Hensley descended the stairs and advanced, Deputy Beasley was trapped in his car and Lieutenant Price had already witnessed Hensley use the gun as a weapon against Rachelle. There was every reason to believe that Deputy Beasley was in imminent threat.

### B.

After erroneously concluding that the Deputies violated Hensley's right to be free from excessive force, the majority avoids ruling upon whether they are entitled to qualified immunity, instead finding that the Deputies waived the issue.

### 1.

To begin, I disagree with the majority's assertion that the Deputies waived the argument that their actions did not violate any clearly established rights. Although the Deputies could have been more precise, in their brief they note that "the Court must determine two issues: 1) did the Defendants violate Hensley's constitutional rights; and 2) if so, was it clearly established at the time that the Defendants [sic] conduct was

34

unconstitutional," Appellant's Br. at 14, and that "[b]oth questions must be answered yes for the Plaintiffs to proceed," Appellant's Br. at 15.

In addition, the history of this case before our court indicates the Deputies did not waive their argument. After the Deputies filed their opening brief, the Appellees moved to dismiss the appeal as interlocutory. The Appellees did not argue that the Deputies had waived step two, but that the Deputies were arguing about fact disputes instead of legal questions. In responding to the motion, the Deputies again made clear that "[a]s argued in their Brief, even viewing the facts in the light most favorable to the Appellees, the Defendant Officers did not violate any constitutional right *and even if they did, it was not clearly established at the time.*" Appellant's Response at 4, ECF No. 35 (emphasis added). With the benefit of that explanation, a panel of this court denied the motion to dismiss.

Finally, the Deputies timely filed a letter under Federal Rule of Appellate Procedure 28(j) after the Supreme Court issued its decision in *White v. Pauly*, 137 S.Ct. 548 (2017). In the 28(j) letter, the Deputies explained:

> *White* is relevant as plaintiff has failed to point to 'clearly established law' that was violated, with a factually similar case. Plaintiff relies on *Pena v. Porter* which describes very different circumstances – the officers were looking for a suspect that was not Pena, went to Pena's home in the middle of the night and saw him sleeping; he came to the door in response to knocks, holding a shotgun, and they immediately shot and killed him. The officers did not receive a 911 call regarding Pena, witness him hit his daughter in the head with a gun and advance on officers with a gun.

Appellant's Supplemental Authorities at 1, ECF No. 37.

These actions sufficiently put the issue of whether the right was clearly established before this court. The majority concludes otherwise, and then, hoping to avoid the practical problem that the Deputies could raise qualified immunity again immediately on remand and file another interlocutory appeal, *see Behrens v. Pelletier*, 516 U.S. 299 (1996) (holding that defendant may bring more than one interlocutory appeal based on qualified immunity), proclaims that the mandate rule precludes the Deputies from raising step two again until "an appropriate time at trial," because the mandate rule "'restricts the district court's authority' to reconsider that issue in a summary judgment proceeding." Majority Op. at 11 n.5 (quoting *Doe v. Chao*, 511 F.3d 461, 465 (4th Cir. 2007)). I do not believe the mandate rule operates to restrict the Deputies from raising qualified immunity again immediately on remand, but, to the extent the majority holds otherwise, I agree that the Deputies can (and should) pursue qualified immunity at trial.

Moreover, even if the Deputies did waive the argument that the law was not clearly established, I would still reach the issue. The majority speaks of waiver in absolute terms but, because waiver is judicially created, "we possess the discretion under appropriate circumstances to disregard the parties' inattention." *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013). Factors we examine in determining whether to use this discretion include whether the record is sufficiently developed to permit us to examine the issue and whether addressing the issue would "enhanc[e] the efficiency of the decisionmaking process" and conserve "judicial resources." *Id.* Although we have never decided if a "party may truly waive waiver," we have used our discretion to excuse a "supposed waiver" when the waiver argument is raised in an untimely fashion. *United*

36

*States v. Ashford*, 718 F.3d 377, 380 (4th Cir. 2013) (internal quotation marks and alterations omitted). After all, "waiver must be a two-way street." *Id.* at 381. Here, the Plaintiffs have not argued that the Deputies waived step two, the summary judgment record is adequate to decide the issue, and a ruling would streamline proceedings by, as explained below, correcting the district court's erroneous recitation and application of the qualified immunity standard.

To be clear, the majority is *sua sponte* concluding that the Deputies waived this argument. The Plaintiffs did not raise waiver in their brief. To the contrary, their brief at several points discusses whether Hensley's right was clearly established. *See*, *e.g.*, Appellees' Br. at 18 ("An objectively reasonable officer should know that shooting a man who was carrying a gun pointing down to the ground on his own property, in a State with open-carry laws, and not raising it in a threatening manner violates the Fourth Amendment. The second prong of the qualified immunity analysis requires the Court to examine whether [the Deputies] violated a clearly established right.").

In my view, the Plaintiffs waived the Deputies' alleged waiver "by addressing the claim on the merits without also making a waiver argument." *Norwood v. Vance*, 591 F.3d 1062, 1068 (9th Cir. 2010). Instead of reaching this common sense conclusion, the majority is choosing to affirm "on a ground that neither" party "had any reason to believe might dispose" of the Deputies' qualified immunity argument, *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 288 (4th Cir. 2004) (Shedd, J., dissenting). Their actions represent the harshest use of the waiver rule I can remember during my time on the court.

2.

The majority's faulty waiver ruling is made more troubling by the simple fact that the district court, in my view, erred in analyzing whether the right at issue was clearly established. The court accepted *Garner* as the clearly established law and then collapsed qualified immunity's two steps:

> The Plaintiffs asserts [sic] that the Defendants' alleged harmful conduct—Price and Beasley's unreasonable use of deadly force to 'seize' the decedent—was conduct clearly proscribed by the Constitution. While a police officer's interaction with a person may or may not ultimately lead to the person's seizure in a constitutional sense, "there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985). *Therefore, if the forecast of evidence would support a jury finding that the deputies' use of deadly force was unreasonable, then both prongs of the pertinent test have been met.*

*Hensley*, 167 F.Supp.3d at 761-62 (emphasis added).

In other words, the court found that the Plaintiffs *only* had to prove that the Deputies used excessive force, because the prohibition against using excessive force is clearly established. The Supreme Court has consistently explained the error in this approach:

> We have repeatedly told courts not to define clearly established law at a high level of generality. The dispositive question is whether the violative nature of particular conduct is clearly established. This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition. Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.

*Mullenix*, 136 S.Ct. at 308 (internal alterations, citations, and quotation marks omitted).

More recently, again in the context of deadly force, the *White* Court explained that "we have held that *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case." *White*, 137 S.Ct. at 552 (internal quotation marks omitted). This case is simply not an "obvious" case where *Garner* and *Graham* apply and, accordingly, the district court committed error in so holding.[8] As a result of the majority's determination of the mandate, that error is now crystalized in the case.

## III.

"The public interest . . . includes the substantial public concern for the safety of police officers lawfully carrying out the law enforcement effort." *United States v. Sakyi*, 160 F.3d 164, 167 (4th Cir. 1998). Today, this court takes yet another step in minimizing that concern and continues its "significant departure from the precedent of this Court and the Supreme Court." *Henry*, 652 F.3d at 553 (Shedd, Circuit Judge, dissenting). Collectively, our jurisprudence continues to raise the specter of a chilling effect on police conduct, "prompting law enforcement officers to choose inaction in order to avoid risking personal liability." *Id.* Before today, when confronted by an armed person who had just committed a violent crime and was advancing towards them, an officer was entitled to believe that they were under imminent threat. Now, however, under the majority's rule, unless and until the officer has either issued a warning or waited for the armed individual

---

[8] Apart from *Garner* and *Graham*, the district court pointed only to an unpublished disposition, *Pena v. Porter*, 316 Fed. App'x 303 (4th Cir. 2009). The majority adds, and misreads, *Cooper*, but that case was decided after the events here and cannot provide the clearly established law the Court requires.

to aim his weapon, further compounding the risk of officer harm, the officers must pause before taking action or face § 1983 liability. Because neither caselaw from our Court nor the Supreme Court supports § 1983 liability in such circumstances, I dissent.[9]

---

[9] Although I understand that police confrontations are under increased scrutiny, and a new framework to assess proper officer conduct could evolve from this scrutiny, we are bound by the law as currently propounded by the Supreme Court.